COMMONWEALTH *vs.* OSBORNE SHEPPARD.

Suffolk.   December 8, 1981. — October 26, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, LYNCH, & O'CONNOR, JJ.

*Search and Seizure.   Evidence,* Admissions and confessions.   *Constitutional Law,* Search and seizure, Admissions and confessions.

At a criminal trial no error appeared in the denial of the defendant's motion to suppress statements made by him during a noncustodial interview at a police station, at a time when the police investigation had not yet focused on the defendant.   [498-499]

The exclusionary rule as enunciated by the Supreme Court of the United States required suppression of incriminating evidence obtained in the course of a police search conducted in good faith and pursuant to a warrant which had been issued on probable cause but which, as the result of negligence by the issuing magistrate, violated the constitutional and statutory requirement that search warrants describe the articles to be seized, and where the affidavit which had been presented to the magistrate, and which did describe the objects of the search, was neither attached to the warrant nor referred to therein.   [499-508] LIACOS and ABRAMS, JJ., concurring.   LYNCH, J., dissenting.

INDICTMENT found and returned in the Superior Court Department on May 14, 1979.

Pretrial motions to suppress evidence were heard by *Ronan, J.,* and the case was tried before him.

*John F. Herlihy, Jr.,* for the defendant.

*Newman A. Flanagan,* District Attorney *(Clyde R. W. Garrigan,* Assistant District Attorney, with him) for the Commonwealth.

WILKINS, J.   In this appeal from a conviction of murder in the first degree, we are faced with the serious and challenging question whether the exclusionary rule, adopted by the Supreme Court of the United States to protect Fourth Amendment rights, requires the suppression of incriminating evidence obtained in the course of a police search con-

ducted in good faith, but pursuant to a warrant which, although issued on probable cause, violated the constitutional and statutory requirement that search warrants describe the things to be seized. See Fourth Amendment to the Constitution of the United States;[1] art. 14 of the Declaration of Rights of the Constitution of the Commonwealth;[2] and G. L. c. 276, § 2.[3] We conclude that, solely on the basis of the opinions of the Supreme Court of the United States, the exclusionary rule requires the suppression of the evidence seized pursuant to this defective warrant. We reject the defendant's other, considerably less substantial challenges to his conviction.

The badly burned body of Sandra D. Boulware, a twenty-nine year old black woman, was found in a vacant lot in the Roxbury section of Boston at approximately 5 A.M. on Saturday, May 5, 1979. Pieces of wire were found on the body and in the vicinity of the body. An autopsy, conducted about 8 A.M. that day, disclosed that the victim had died of multiple compound comminuted skull fractures, caused by at least four blows inflicted within a day of the autopsy. There was medical testimony that the victim was alive, but unconscious, at the time her body was set on fire, but that she succumbed to the blows inflicted on her and not as a result of the burning of her body.

---

[1] The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] Article 14 provides, in part, that "[e]very subject has a right to be secure from all unreasonable searches, and seizures, of . . . all his possessions. All warrants, therefore, are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; and if the order in the warrant . . . to make search in suspected places . . . or to seize . . . property, be not accompanied with a special designation of the . . . objects of search . . . or seizure."

[3] General Laws c. 276, § 2, as appearing in St. 1964, c. 557, § 2, provides in part that "[s]earch warrants . . . shall particularly describe the property or articles to be searched for." They must be substantially in the form prescribed in G. L. c. 276, § 2A.

The victim's sister had reported her missing on May 4, and said that she had last seen her on May 1. She identified the body at the morgue. The police learned that the victim had two boyfriends, "Rudy" and "Jimmy." The defendant was known as "Jimmy." The police interviewed "Rudy" on Saturday afternoon, May 5. They also undertook to locate the defendant. Two police officers who knew the defendant went looking for him. They eventually went to a house in Dorchester known as a "gaming house," because card games were regularly played there. After they rang the doorbell, the defendant answered the door. The police told him that "the Sergeant" wanted to talk to him at the police station. The defendant said, "Let me get my coat." He went upstairs, accompanied by one of the police officers, and obtained his coat. The defendant, who was not hand-cuffed, rode to the police station in the back seat of an un-marked police cruiser; the two policemen were in the front seat. The defendant had had experience with police inves-tigations; he had been arrested previously; and he knew he was not in custody. One of the policemen gave the defend-ant Miranda warnings. In answer to questions in the cruis-er, the defendant said he had last seen the victim on Tues-day (May 1). He had gone to her house, stayed there for about an hour, and left with her in a taxicab. They stopped to purchase some marihuana and a bottle of amaretto. The victim left him, he said, at 1 P.M. and he had not seen her since. One of the policemen told the defendant that Sandra Boulware was "no longer with us."

At the District 2 police station, Sergeant Bornstein inter-viewed the defendant in the presence of several other offi-cers. The interview, which lasted about an hour, was recorded on tape.[4] The defendant substantially repeated what he had said in the police cruiser on the way to the police station and added that on Tuesday, after purchasing

---

[4] The tape was introduced as an exhibit and was heard by the judge during the hearing on the defendant's motion to suppress. At the trial, the tape was introduced as an exhibit and heard by the jury.

the marihuana and the amaretto, he and the victim had gone to the defendant's home at 42 Deckard Street in Roxbury where the victim stayed until she left at 2 P.M. to take a cab. The defendant gave an explanation of his whereabouts from Tuesday (when he claimed he last saw the victim) until Saturday (the day of the interview). He said that he had been at the "gaming house" in Dorchester, where the police found him, from 9 P.M. on Friday (May 4) until he left at 5 A.M. on Saturday (May 5) to take a bus home to Deckard Street. The defendant identified various people who were at the "gaming house" that night. At the end of the interview, Sergeant Bornstein thanked the defendant, and the defendant left the station.[5]

The police continued their investigation. They interviewed the men who the defendant had said were at the "gaming house" on Friday night. They learned that at about 3 A.M. on Saturday, the defendant had borrowed the car of one Barros to drive two men home. He dropped them off in a trip that took no more than fifteen minutes. The defendant returned the car to the "gaming house" at about 4:45 A.M. He lay down for only a few minutes, suddenly jumped up, said he had something to do, and left.

The police also learned that at approximately 6 A.M. on Saturday, an occupant of the "gaming house," one "Pee Wee," had left for work. He noticed a pair of black calfskin gloves and a gas can in a corner of the porch, and brought them into the house. The police took possession of these items on Sunday morning.[6]

In the course of their investigation on Sunday morning, the police learned from a friend of the defendant that the

---

[5] The defendant's motion to suppress evidence included a challenge to the admissibility of his statements to the police in the cruiser and at the District 2 police station.

[6] At the trial, "Pee Wee" testified that on Saturday (May 5) in the afternoon, when he arrived back at the "gaming house," the defendant was there and said, "[O]h Pee Wee, I see that you brought my gloves and gas can in . . . . I appreciate it very much." The police and the prosecution were not aware of this statement until the trial.

basement of the defendant's home at 42 Deckard Street had been refinished and that the defendant had said that he entertained women there. On Sunday morning they also spoke with Barros, the owner of the car the defendant was said to have borrowed early on Saturday morning. Barros corroborated the fact that the defendant had borrowed his car, a 1975 black Thunderbird. Only the defendant had used the car in the interim. The police then inspected the Thunderbird with Barros's consent. They found bloodstains and pieces of hair on its rear bumper and near the lid of the trunk. Barros told the police that there had been no blood in the trunk or along the bumper on Friday night when he had driven the car home. Various samples were taken. Inside the trunk, the police found three types of wire.

Later Sunday morning, the district attorney for the Suffolk district, Sergeant Bornstein, and Detective Peter J. O'Malley met at the District 2 police station to discuss the case. They concluded that they should seek a warrant for the arrest of the defendant and a warrant to search 42 Deckard Street, Roxbury. Detective O'Malley prepared and typed an affidavit in support of an application for a search warrant. The district attorney, his first assistant, and Sergeant Bornstein looked at it and concluded that it set forth probable cause for the arrest and for the search.[7]

---

[7] The circumstances set forth in the affidavit are as follows: "On Saturday 5/5/79 at 5:00 A.M. the body of Sandra D. Boulware was found beaten and burned to death opp. 28 Hazelwood St. Rox. in a vacant field. At the time she appeared to be only partially clothed. In the course of the investigation that followed, it was determined that one Osborne Sheppard of 42 Deckard St. Rox. was the last person to have been seen with Sandra. In an interview [he] gave to Sgt. Bornstein, O. Sheppard stated that he and Sandra went to 42 Deckard St. Rox. on 5/1/79, which is the last date she was seen. That prior to going there, they had stopped and bought 2 nickel bags of herb and a fifth of amaretto liquor. Officers in this investigation have established that O. Sheppard was in possession of a 1975 blk. Ford Thunderbird, Mass. Reg. VLB PNB for a period of time, ending just before the body of Sandra was found. And that this vehicle was found to have human blood on the rear bumper that wasn't there prior to his [having] taken possession. Also in the trunk of this car were

It is at this point that problems began that led to the issuance of a defective warrant. It was then Sunday afternoon. No clerk or assistant clerk of the Roxbury Division of the District Court Department could be found, nor could a suitable form of search warrant be found at the District 2 police station or at two or three other stations. Detective O'Malley found a warrant form of the Municipal Court of the Dorchester District, once used for searches for controlled substances. He attempted to adapt the printed form. He crossed out the words "controlled substance" on the cover side of the form. On the face side, he replaced the word "Dorchester" with the word "Roxbury." He inserted a reference to "2nd & Basement" of 42 Deckard Street as the place to search. However, the reference to "controlled substance" was not deleted in those portions of the form that constituted the application for a search warrant and would constitute the warrant itself.

Arrangements were made to present the affidavit and applications for a search warrant and an arrest warrant to a judge at his home. Detective O'Malley, Sergeant Bornstein, two homicide detectives, and the first assistant district attorney went to the judge's home, arriving at approximately

---

found various pieces of wire and rope that may have been used to bind parts of her body. Pieces of wire were found on the body. O. Sheppard has told McKinley Grimes, a friend, that in the past he has taken women friends to his cellar at 42 Deckard St. for social purposes and has worked on the cellar to make it comfortable." (Corrected for punctuation and spelling errors.)

The affidavit described the premises to be searched as the second floor at 42 Deckard Street, Roxbury, and "that part of the cellar controlled by Osborne [Jimmy] Sheppard." It described 42 Deckard Street as a "three story red brick apartment building with a basement."

The affidavit listed the property for which the search was intended as follows: "A fifth bottle of amaretto liquor, 2 nickel bags of marijuana, a woman's jacket that has been described as black-grey (charcoal), any possessions of Sandra D. Boulware, similar type wire and rope that match those on the body of Sandra D. Boulware, or in the above Thunderbird. A blunt instrument that might have been used on the victim, men's or women's clothing that may have blood, gasoline burns on them. Items that may have fingerprints of the victim." (Corrected for punctuation and spelling errors.)

2:45 P.M. The judge took Detective O'Malley's oath and signed the affidavit to that effect. The judge searched his library without success for an appropriate form of search warrant. He then took the "controlled substance" form from Detective O'Malley, made some changes on it, and dated and signed the warrant. The judge made no change in the substantive portion of the printed warrant form which, therefore, contained authority "to search for any controlled substance, article, implement or other paraphernalia used in, for, or in connection with the unlawful possession or use of any controlled substance." The warrant made no reference to the items listed in Detective O'Malley's affidavit in support of the application. It neither listed them, nor incorporated them by reference; nor was the affidavit attached to the warrant.[8] The judge gave the search warrant, the affidavit, and the arrest warrant to the police. The defendant raises no challenge to the arrest warrant. Detective O'Malley left the judge's home with the affidavit and had it with him during the search. He thought the search warrant was legal and proper when he left the judge's home. The arrest warrant was executed at the "gaming house," while Detective O'Malley and a team of police personnel went to 42 Deckard Street to search its second floor and basement.

At about 5 P.M. Detective O'Malley and others were admitted to 42 Deckard Street. Detective O'Malley spoke with the defendant's mother and sister, showed them the warrant, and said the police were going to look in the defendant's room and in the cellar for things that were implicated in a homicide. It does not appear that either of the two women read the warrant or asked to have it read.

We summarize the evidence seized at 42 Deckard Street which was introduced at the trial. From the defendant's

---

[8] We note in passing, although the Commonwealth makes no point of it before us, that the warrant on its face authorized a search for marihuana, that the affidavit referred to marihuana, and that a search for marihuana at 42 Deckard Street was justified by probable cause.

second floor bedroom, the police took apparently blood-stained black boots. In the cellar, part of which was furnished as a playroom, Detective O'Malley found what appeared to be blood stains on the concrete floor and chipped off and took pieces of that concrete. He found two unmatched women's earrings, one apparently with bloodstains, under a piece of plywood which in turn was under a mat in the unfinished portion of the cellar. In the unfinished portion of the cellar, he found an apparently blood-stained envelope, a pair of apparently bloody men's jockey shorts and women's leotards, later determined to be bloodstained. He also found there three types of wire and a woman's hairpiece.

We interrupt the chronology of events to describe evidence introduced at the trial bearing on the significance of these items seized at 42 Deckard Street. A police chemist testified that wire found at the murder scene was similar to wire found in the Thunderbird and in the basement of 42 Deckard Street. He also found a close resemblance between wire of a different type found in the cellar and also in the Thunderbird. A neighborhood friend of the victim identified the bloody earring recovered from the basement as looking like one the victim was wearing about one week before her disappearance. She also identified the leotards as of a type she and the victim had purchased together and the hairpiece as one the victim was wearing the last time she saw the victim alive on Monday, the day before she disappeared. Another witness identified the earring as belonging to the victim.

A special agent of the FBI, assigned to the serology unit of the FBI laboratory in Washington, D.C., testified that blood from the bumper of the Thunderbird was human blood, type O, and contained enzyme groups PGM 2-2 and EAP B-A; that the right black boot found in the defendant's bedroom had human blood on it, type O, with enzymes PGM 2-2 and EAP B-A; that blood found underneath the victim's head at the murder scene was human blood containing enzymes PGM 2-2 and EAP B-A (but he could not

determine the blood grouping); that blood taken from the victim's body by the medical examiner contained enzymes PGM 2-2 and EAP B-A. There was other evidence introduced showing that the victim had blood type O. The concrete chips and the envelope taken from the cellar were found to be stained with type O blood. The FBI expert witness testified further that about 1 % of the population would have blood type O and the enzymes PGM 2-2 and EAP B-A.

It can readily be seen that evidence seized in the search of 42 Deckard Street tended to show that the defendant seriously injured the victim in his cellar, hid her earrings under a piece of plywood under a mat, and tied her up with wire available in the cellar of his home. This evidence, much of it obtained as a result of careful and commendable police investigatory techniques, was highly probative of the defendant's guilt. Although the Commonwealth could have presented a case against the defendant without this evidence, this evidence was most important in rounding out a case based only on circumstantial evidence.

An indictment was returned against the defendant on May 14, 1979, charging him with murder, including murder in the first degree, of Sandra D. Boulware. The defendant moved to suppress the statements he made to the police on May 5 and the items seized on May 6 at 42 Deckard Street. He claimed, among other things, that his interrogation on May 5 was a custodial interrogation in violation of his Fourth Amendment rights. In turn, he argued that the search warrant was based on his statements to the police and that the items seized pursuant to the search warrant had to be suppressed as the product of his unconstitutional interrogation. Further, he argued that the items seized at 42 Deckard Street should be suppressed because they were seized pursuant to a defective, unconstitutional search warrant.

A judge of the Superior Court held a three-day hearing on the motion to suppress in September, 1980. He made extensive findings of fact and rulings of law. He dealt with certain issues that are not argued on appeal. He concluded

that the defendant freely and voluntarily made statements on May 5 at the District 2 police station after a knowing waiver of his Miranda rights. He concluded that the investigation had not then focused on the defendant. He did not explicitly discuss the defendant's argument that his statements should be suppressed because of his "illegal arrest" or "seizure," but it is apparent from his findings that he regarded the defendant's trip to the police station and his statements made there as voluntary. He, therefore, denied the motion to suppress as it applied to the defendant's statements to the police on May 5.

On the matter of the search warrant, he concluded that the warrant was issued on probable cause. He concluded, however, that the warrant was defective because it failed to list the items to be seized or to incorporate a list of those items by reference. He then considered whether the exclusionary rule as applied to Fourth Amendment violations required suppression of the evidence seized pursuant to the defective warrant. He had found that the police had a legitimate need to proceed with dispatch in obtaining the search warrant. The defendant was at liberty and could reasonably be expected to learn from those questioned at the "gaming house" that the police were investigating him. He found further that the judge told Detective O'Malley that he would make the necessary changes in the warrant form so as to provide a suitable form of search warrant and that the warrant as delivered was sufficient authority in form and content to carry out the search as requested. He found also that the search of 42 Deckard Street was carried out within the limits that Detective O'Malley understood the warrant to permit and that Detective O'Malley had the affidavit and search warrant with him at 42 Deckard Street. He concluded that "the actual search undertaken was within the limits of the authority the police thought reasonably had been granted." He denied the defendant's request to suppress the evidence seized at 42 Deckard Street.

The judge concluded that the good faith exception to the exclusionary rule advanced by certain judges in *United*

*States* v. *Williams*, 622 F.2d 830, 840-847 (5th Cir. 1980) (en banc) (alternative holding), cert. denied, 449 U.S. 1127 (1981), was well reasoned and persuasive. He gave greater weight to the opinion of this court in *Commonwealth* v. *Rugaber*, 369 Mass. 765, 769 (1976), in which we upheld admission of evidence seized pursuant to an assumedly defective search warrant. He regarded the *Rugaber* case as "a situation where law enforcement officials acted mistakenly but upon probable cause and in good faith and which presented a factual situation in which exclusion would have no deterrent effect."[9] He concluded that the police who executed the warrant at Sheppard's dwelling would act similarly in similar situations in the future, and that "the only consequence of applying the exclusionary rule would be to keep from the jury probative evidence and thereby impair the truth finding function." The judge did not cite any case in which the exclusionary rule had been considered in a situation in which error was committed, not by the police or law enforcement officials, but by a judge or issuing magistrate. Neither the *Williams* case nor the *Rugaber* case, relied on by the judge, were opinions of the Supreme Court, which, of course, has the final word on this question.

1. The judge properly denied that portion of the defendant's motion to suppress evidence that was directed toward his statements made to the police on Saturday, May 5. The

---

[9] In the *Rugaber* case, a search was conducted on probable cause pursuant to a search warrant that properly described the street address of the premises to be searched but contained a physical description of a house next door. *Commonwealth* v. *Rugaber*, 369 Mass. 765, 767 (1976). The warrant was executed at night; officers on the scene directed the executing officers to the proper house; the proper premises were in fact searched; and the officers were unaware of the misdescription when they executed the warrant. *Id.* We regarded the case as a close one. *Id.* at 768. We noted that "[i]nvocations of error and inadvertence cannot ordinarily save an invalid warrant." *Id.* at 767. The police were not reckless but at most negligent in the description. *Id.* In these circumstances, we "agree[d] with the judge, who ruled that even if the warrant was defective, the exclusionary rule should not be applied, since it could have no deterrent effect." *Id.* at 769. The case before us is not, of course, like the *Rugaber* case, one in which the search warrant was ambiguous.

judge found, on ample evidence, that the defendant voluntarily accompanied the police to the station. At the time of the interview, the police investigation had not yet focused on the defendant, and the officers only requested, but did not order, that he accompany them to the station for questioning. He was not handcuffed; he rode alone in the back of the unmarked police cruiser; he knew he was not in custody. When the interview ended, the sergeant thanked him for his cooperation, and he left.

This issue is substantially disposed of by what we said recently in *Commonwealth* v. *Bookman*, 386 Mass. 657, 659-661 (1982). This is not a case like *Dunaway* v. *New York*, 442 U.S. 200 (1979), on which the defendant relies, where there was a custodial interrogation, not supported by probable cause, of a defendant who was involuntarily detained. The circumstances here are like those in *United States* v. *Mendenhall*, 446 U.S. 544, 557-558 (1980), in which the Court held that the defendant's Fourth Amendment rights were not violated when she voluntarily accompanied law enforcement agents to their office for questioning. As in the *Mendenhall* case, the prosecution here met its burden of proving that the interview was not the product of express or implied coercion, but resulted from the defendant's voluntary consent. See, as to the absence of Fourth Amendment violations where persons consent to accompany police officers to station houses for· interrogation, *United States* v. *Huberts*, 637 F.2d 630, 635-637 (9th Cir. 1980), cert. denied, 451 U.S. 975 (1981); *United States* v. *Williams*, 604 F.2d 1102, 1125-1126 (8th Cir. 1979). See also *Commonwealth* v. *Walden*, 380 Mass. 724, 730-731 (1980) (interrogation of a defendant who went voluntarily to the police station).

2. We come then to the question of the admissibility of the evidence seized at 42 Deckard Street purportedly pursuant to the search warrant. We start with our expression of agreement with the judge's conclusion that the warrant was defective. It failed to describe the items sought to be

seized.[10]   There is authority upholding a warrant, which does not on its face list any items to be seized, but which incorporates by reference an accompanying or attached description of the items to be seized.[11]   The warrant in this case, however, described items (drugs and drug paraphernalia) different from those listed in the affidavit (which related to the murder of Sandra Boulware, but did include marihuana).   Moreover, the warrant was not attached to Detective O'Malley's affidavit which listed the items which the judge had found there was probable cause to seize. Most importantly, the warrant did not contain any words which referred to the affidavit.   It is true that Detective O'Malley had with him, when he conducted the search, the application for a warrant which listed the items to be seized. We noted in *Commonwealth* v. *Taylor*, 383 Mass. 272, 277 n.5 (1981), that we were not called on there to decide "whether we would allow a separate document to supply the specificity if, though physically attached to the warrant, it was not referred to therein."[12]   Here, however, not only is there a lack of reference, but also the warrant listed a different

---

[10] The Fourth Amendment requires that a search warrant describe the "things to be seized."   See *Marron* v. *United States*, 275 U.S. 192, 196 (1927).   Article 14 of the Massachusetts Declaration of Rights requires that the warrant be "accompanied with a special designation of the . . . objects" of seizure.   The purpose of these limitations is to forbid general warrants (see *Boyd* v. *United States*, 116 U.S. 616, 624-626 [1886]), and in doing so to circumscribe the discretion of the executing officer and to inform the person or persons subject to the seizure what the officer is entitled to take.   See *Commonwealth* v. *Accaputo*, 380 Mass. 435, 444-445 (1980); *Matter of the Application of Lafayette Academy, Inc.*, 610 F.2d 1, 4 (1st Cir. 1979).   See also G. L. c. 276, § 2, which requires that the warrant "particularly describe the property or articles to be searched for."

[11] *Commonwealth* v. *Taylor*, 383 Mass. 272, 276-277 (1981), and cases cited.

[12] In the *Taylor* case, *supra* at 277 n.5, we noted *Castle News Co.* v. *Cahill*, 461 F. Supp. 174, 181 (E.D. Wis. 1978), which sustained a warrant that did not refer to an attached document which provided the requisite specificity.   To the same general effect, see *Moore* v. *United States*, 461 F.2d 1236, 1238-1240 (D.C. Cir. 1972).   Contra *Brooks* v. *Taylor Tobacco Enters.* 298 N.C. 759, 763-764 (1979).

set of items to be seized, and no further description was attached to the warrant. We are not aware of any court that has gone so far as to uphold a general warrant to search particular premises where the searching officer had with him a description of the items to be seized but the warrant made no reference to that description and that description was not attached to the warrant. We thus proceed on the premise that the search warrant in this case violated the requirements of the Fourth Amendment to the United States Constitution, art. 14 of the Declaration of Rights, and G. L. c. 276, § 2. The question remains whether the defect in the warrant requires the suppression of evidence obtained in the search.

The exclusionary rule is "a judicially created means of effectuating the rights secured by the Fourth Amendment." *Stone* v. *Powell*, 428 U.S. 465, 482 (1976). It is "designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than [as] a personal constitutional right of the party aggrieved." *United States* v. *Calandra*, 414 U.S. 338, 348 (1974). See *United States* v. *Peltier*, 422 U.S. 531, 538-539 (1975). Moreover, because, under some circumstances, evidence obtained as the result of an unreasonable search or seizure in violation of Fourth Amendment rights is admissible, the exclusionary rule is not coextensive with the prohibitions of the Fourth Amendment.[13]

Furthermore, because evidence obtained in violation of the Fourth Amendment is admissible in particular circumstances, the notion that such evidence must in all instances

---

[13] Instances in which evidence obtained in violation of the Fourth Amendment is admissible in judicial proceedings include: (a) a case in which no objection is raised to the introduction of such evidence, (b) the use of such evidence in grand jury proceedings (*United States* v. *Calandra*, 414 U.S. 338, 350-352 [1974]), (c) introduction of such evidence for the impeachment of a defendant (*Walder* v. *United States*, 347 U.S. 62 [1954]), (d) circumstances in which the defendant has no standing to challenge the constitutional violation (*Rakas* v. *Illinois*, 439 U.S. 128 [1978]), and (e) the use of evidence seized by one sovereign in civil proceedings brought by another sovereign (*United States* v. *Janis*, 428 U.S. 433, 453-454 [1976]).

be excluded in order to preserve judicial integrity fails as a substantial, independent support for the rule. *Stone* v. *Powell*, 428 U.S. 465, 485 (1976). *Id.* at 499 (Burger, C.J., concurring). See *United States* v. *Janis*, 428 U.S. 433, 458-459 n.35 (1976).[14]

The substantial, and perhaps only, justification for the exclusionary rule relied on by a majority of the Justices of the Supreme Court is the goal of deterring unconstitutional conduct by the police and other law enforcement personnel. See *Stone* v. *Powell*, 428 U.S. 465, 486 (1976); *United States* v. *Peltier*, 422 U.S. 531, 542 (1975); *United States* v. *Calandra*, 414 U.S. 338, 347 (1974). As we have demonstrated in this opinion, the police conduct in this case was proper. They had probable cause to search the premises, and they prepared an adequate affidavit setting forth that probable cause and submitted it to a judge.[15] The police then received a search warrant that they reasonably believed, on advice from the judge, was adequate to justify a search of the designated premises for the items listed in the application for the warrant.

---

[14] We acknowledge the views of Mr. Justice Brennan that the exclusionary rule enables "the judiciary to avoid the taint of partnership in official lawlessness" and assures the people "that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government." *United States* v. *Calandra, supra* at 357 (Brennan, J., dissenting). See also *United States* v. *Peltier*, 422 U.S. 531, 551-562 (1975) (Brennan, J., dissenting). There are those critics of the rule who would suggest, however, that exclusion of probative and reliable evidence itself seriously undermines popular trust in government. See references in Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 737-738 (1970), and in Sunderland, Liberals, Conservatives, and the Exclusionary Rule, 71 J. Crim. L. & Criminology 343, 359-360 (1980). See also *Stone* v. *Powell*, 428 U.S. 465, 491 (1976).

[15] This is not, therefore, a case in which the police failed to demonstrate probable cause in the application for the warrant. In such a situation, a magistrate's erroneous conclusion that probable cause was shown could not breathe validity into a warrant. Application of the exclusionary rule would be justified to deter future, inadequate presentations by officer-affiants. See *Franks* v. *Delaware*, 438 U.S. 154, 164-165 (1978); *Aguilar* v. *Texas*, 378 U.S. 108, 114-116 (1964).

The police next conducted a search of Sheppard's dwelling in a manner consistent with their good faith belief that a proper warrant had been issued. They did not exceed the scope of the search that would have been authorized by a warrant in the form that they sought and believed they had. The items that were the subject of the intended search were disclosed on the application for the warrant, which was present at the scene of the search. In short, the police conducted the search in a good faith belief, reasonably held, that the search was lawful and authorized by the warrant issued by the judge. The defect in the warrant was not harmful to the defendant in the circumstances of the actual search. The search was conducted in the same way and with the same results as it would have been conducted if the warrant had not been defective.[16]

The question is whether an error of a magistrate, unrelated to police error, calls for the application of the exclusionary rule. It could be argued that the exclusionary rule should apply with particular force to evidence seized pursuant to a search warrant failing to meet Fourth Amendment standards, issued by a judge who should have known, and should have been most sensitive to, the defendant's constitutional rights. If a "criminal is to go free because the constable has blundered" (*People* v. *Defore*, 242 N.Y. 13, 21 [1926] [Cardozo, J.]), perhaps the criminal should go free as well because the magistrate blundered, even though "the suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case." *United States* v. *Payner*, 447 U.S. 727, 734 (1980). The issue is whether the exclusionary rule should be applied to deny to a jury evidence highly probative of the defendant's guilt of murder because a judge, negligently but

---

[16] We note that there is no issue in this case as to the reliability of the evidence sought to be excluded. Unlike evidence, such as a confession, obtained in violation of constitutional rights, the physical evidence seized from 42 Deckard Street has not been rendered untrustworthy by the fact that it was seized pursuant to a constitutionally defective warrant. See *Stone* v. *Powell*, 428 U.S. 465, 490 (1976).

in good faith, failed to strike out certain words in the warrant and failed to refer to, or to attach to it, a list of the items to be seized. We are not dealing here with judicial error rising above the level of negligence.[17]

We have found little discussion of the goal of deterrence underlying the exclusionary rule as applied to an error of a judge, except as related to his misconception of the propriety of police conduct.[18] On occasion, the exclusionary rule has been characterized as directed not only toward deterring police misconduct but also "official misconduct" or

_____

[17] We acknowledge that in this case the problem arose on a Sunday in circumstances in which no proper form of warrant was readily available to the judge and there was a need for prompt action. We do not, however, intend to minimize the judge's error. The failure properly to describe in the warrant the items to be seized was a serious omission of constitutional significance.

[18] In *Richmond* v. *Kentucky*, 29 Crim. L. Rep. (BNA) 2529 (Ky. Ct. App. July 31, 1981), aff'd on other grounds, 637 S.W.2d 642 (Ky. Sup. Ct. 1982), the court did not suppress evidence seized in good faith pursuant to a warrant issued on probable cause by a judge who, it was assumed, lacked authority to issue the warrant in the district in which it was issued. There was no showing that the judge acted in bad faith. See *United States* v. *Acosta*, 501 F.2d 1330, 1337 (5th Cir. 1974) (Gee, J., dissenting) ("Nor would I expand the [exclusionary] rule to 'deter' magistrates from failing to record matter upon which they rely, conceiving that they will obey the mandates of reviewing magistrates, such as we, when these are understood"), modified, 509 F.2d 539 (5th Cir.), cert. denied, 423 U.S. 891 (1975); *State* v. *Lien*, 265 N.W.2d 833, 840-841 n.1 (Minn. 1978), quoting *State* v. *Nolting*, 312 Minn. 449, 456-457 n.7 (1977) (exclusionary rule is directed at police, not magistrate, misconduct).

For a contrasting view, see *United States* v. *Karathanos*, 531 F.2d 26, 33-34 (2d Cir.) ("[T]he exclusionary rule [     ] [has the] effect of making . . . [magistrates] aware that their decision to issue a search warrant is a matter of importance . . . in regard to the success of any subsequent criminal prosecution. [It] may well induce them to give search warrant applications the scrutiny which a proper regard for the Fourth Amendment requires . . . . [Also,] the present universal application of the exclusionary rule . . . gives law enforcement officers no . . . incentive to seek out the most lenient magistrates"), cert. denied, 428 U.S. 910 (1976). See also *Powell* v. *Stone*, 507 F.2d 93, 98 (9th Cir. 1974), rev'd on other grounds, 428 U.S. 465 (1976), in which the Ninth Circuit Court of Appeals applied the exclusionary rule to evidence seized in good faith pursuant to an unconstitutional substantive statute in order to "deter[     ] legislators from enacting such statutes."

"the Government's unlawful conduct." See *United States v. Calandra*, 414 U.S. 338, 348 (1974).[19]

There may be reasonable distinctions between police misconduct and an error of a magistrate such as is involved in this case. Police officers have the objectives of apprehending criminal wrongdoers and of obtaining evidence to convict them. As the Supreme Court has said, they are engaged in the "often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). The exclusionary rule is applied to evidence seized in an unlawful manner by law enforcement officials because it is assumed that such exclusion will "deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures . . . '[by] compel[ling] respect for the constitutional guaranty in the only effectively available way — by removing the incentive to disregard it.'" *United States v. Calandra, supra* at 347, quoting from *Elkins v. United States*, 364 U.S. 206, 217 (1960). See *Stone v. Powell*, 428 U.S. 465, 492 (1976); *Michigan v. Tucker*, 417 U.S. 433, 447 (1974).

Unlike police officers, magistrates who issue search warrants are required by law to be neutral and detached. According to the Supreme Court, only if the issuing magistrate is detached from the often competitive business of ferreting out crime can a search warrant satisfy the Fourth Amend-

---

[19] This court has not dealt with the application of the exclusionary rule to deter conduct of judges or magistrates. We have said that "[o]ne branch of the government should not be permitted to use the flagrant wrongdoing of another branch of government to punish a citizen." *Commonwealth v. Nine Hundred & Ninety-two Dollars*, 383 Mass. 764, 771 (1981). In that case, however, we were dealing with alleged police misconduct. We concluded there that, under art. 14 of the Declaration of Rights, a negligent misrepresentation in an affidavit in support of a search warrant of a fact material or necessary to a finding of probable cause would not alone require the suppression of evidence seized pursuant to such a warrant. *Id.* We noted that where "a police affiant's misstatement is the product of good faith but negligent conduct, the motivation to temper and regulate police behavior is less and the arguments against the government's using the product of that good faith but negligent conduct against a defendant are weakened." *Id.*

ment. *Johnson* v. *United States, supra.* Here, Sheppard does not claim that the issuing judge joined the police officers in an attempt to investigate Sandra Boulware's homicide, or that the judge was anything but impartial to, and disentangled from, the investigation. Contrast *Lo-Ji Sales* v. *New York,* 442 U.S. 319, 326-328 (1979) (town justice acting as a member of a search party under a general warrant).

An issuing magistrate, in contrast to a law enforcement official, should not be involved in searching for evidence, apprehending suspects, and convicting criminals. His job is not a partisan one of ferreting out evidence and seeing it used to prosecute criminals. Instead, he should care foremost about whether he correctly applies the laws of the State and nation, including the Fourth Amendment and art. 14 of the Declaration of Rights. Ideally, he should be indifferent as to whether a particular piece of evidence is admitted at trial or a particular defendant is convicted. The police, in contrast, properly should be partisan, investigatory, and oriented toward discovering and convicting perpetrators of crime.

The exclusionary rule may not be well tailored to deterring judicial misconduct. If applied to judicial misconduct, the rule would be just as costly as it is when it is applied to police misconduct, but it may be ill-fitted to the job-created motivations of judges. As we have said, ideally a judge is impartial as to whether a particular piece of evidence is admitted or a particular defendant convicted. Hence, in the abstract, suppression of a particular piece of evidence may not be as effective a disincentive to a neutral judge as it would be to the police. It may be that a ruling by an appellate court that a search warrant was unconstitutional would be sufficient to deter similar conduct in the future by magistrates. We question, therefore, whether suppression of evidence is necessary as a deterrent in cases where the police conduct was entirely proper, the defendant was not prejudiced by the magistrate's error, and an appellate court clearly identifies the magistrate's error of law as a guide to future conduct.

We recognize that our task is to seek to apply the interpretations of the Constitution of the United States expressed by the Supreme Court of the United States. The usual result in a case where a warrant fails to describe the items to be seized is the suppression of the evidence seized pursuant to that warrant. See *Coolidge* v. *New Hampshire*, 403 U.S. 443, 471 (1971). Although there are statements of individual Justices of the Supreme Court critical of the application of the exclusionary rule in particular circumstances,[20] we conclude, on the basis of opinions of the Supreme Court to

---

[20] See *Stone* v. *Powell*, 428 U.S. 465, 501 (1976) (Burger, C.J., concurring); *id.* at 538-540 (White, J., dissenting); *Bivins* v. *Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 411-427 (1971) (Burger, C.J., dissenting); *Rakas* v. *Illinois*, 439 U.S. 128, 156 n.5 (1978) (Powell, J., concurring); *Brown* v. *Illinois*, 422 U.S. 590, 611-612 (1975) (Powell, J., concurring); *Michigan* v. *Tucker*, 417 U.S. 433, 447 (1974).

These expressions of opinion suggest that, in certain instances at least, a good faith exception to the exclusionary rule might be adopted. Such an exception was recognized as appropriate by a majority of the judges of the Fifth Circuit Court of Appeals in *United States* v. *Williams*, 622 F.2d 830, 840-847 (5th Cir. 1980) (en banc) (alternative holding), cert. denied, 449 U.S. 1127 (1981). In a recent opinion, the Court noted, however, that "the State contends that the police conduct here argues for adopting a 'good faith' exception to the exclusionary rule. To date, we have not recognized such an exception, and we decline to do so here." *Taylor* v. *Alabama*, 457 U.S. 687, 693 (1982). That case involved the suppression of a confession made shortly after an illegal arrest unsupported by probable cause.

For a detailed discussion of the appropriateness of a good faith exception, see Ball, Good Faith and the Fourth Amendment: The "Reasonable" Exception to the Exclusionary Rule, 69 J. Crim. L. & Criminology 635 (1978).

It has also been suggested that the exclusionary rule not apply to serious crimes. See Kaplan, The Limits of the Exclusionary Rule, 26 Stan. L. Rev. 1027, 1046-1049 (1974). Professor Kaplan notes certain problems, however, with the adoption of an exception to the exclusionary rule even where the police error is inadvertent and reasonable. *Id.* at 1044-1045. See 1 W. LaFave, Search and Seizure § 1.2 (d), (e), and (f), at 34-39 (1978).

The Model Code of Pre-Arraignment Procedure § SS 290.2 (2) (1975), suggests that, apart from constitutional mandates, a motion to suppress evidence should be granted only where the asserted violation is substantial. In determining the substantiality of the violation, the Model Code directs courts to consider all the circumstances, including the extent of the deviation from lawful conduct, the extent to which the violation was

date, that the exclusionary rule requires the suppression of
the evidence seized at 42 Deckard Street.[21]  Because the ex-
clusionary rule as applied by the Supreme Court in imple-
menting the purposes of the Fourth Amendment requires
the suppression of this evidence, we need not consider
whether the evidence should be suppressed pursuant to the
laws of this Commonwealth.  To this date this court has not
adopted an exclusionary rule under the law of the Common-
wealth to remedy a violation of a criminal defendant's
art. 14 rights.[22]

---

wilful, the extent to which privacy was invaded, the extent to which ex-
clusion will tend to prevent violations of the law, and the extent to which
the violation prejudiced the defendant's ability to defend himself.  *Id.* at
§ SS 290.2 (4).

[21] There is no basis for concluding that this evidence was only cumulative.
It was of probative force tending, independently of other evidence, to prove
the defendant's guilt.  Therefore, its admission cannot be upheld on the
ground that such admission was harmless beyond a reasonable doubt.

[22] Before *Mapp* v. *Ohio*, 367 U.S. 643 (1961), applied the exclusionary
rule to the States through the Fourteenth Amendment, illegally seized
material could be admitted in evidence in the courts of this Common-
wealth.  See *Commonwealth* v. *Spofford*, 343 Mass. 703, 706 (1962); *Com-
monwealth* v. *Wilkins*, 243 Mass. 356, 359 (1923) (art. 14 of the Declara-
tion of Rights does not bar admission of unlawfully seized evidence).
    We have noted the possibility of affording more substantive protection
to criminal defendants under art. 14 of the Declaration of Rights than
under the Fourth Amendment as applied through the Fourteenth Amend-
ment.  See *Commonwealth* v. *Podgurski*, 386 Mass. 385, 391 n.11 (1982);
*District Attorney for the Plymouth Dist.* v. *New England Tel. & Tel. Co.*,
379 Mass. 586, 589 (1980); *id.* at 597 n.1 (Liacos, J., dissenting); *Com-
monwealth* v. *Ortiz*, 376 Mass. 349, 358 (1978).  We have concluded
that, where the police intentionally deprived a defendant of his statutory
right to use a telephone (G. L. c. 276, § 33A), "evidence of an in-custody
inculpatory statement or corporeal identification, even if accidental,
should not be admitted unless the Commonwealth can show beyond a
reasonable doubt that the evidence is untainted by the deprivation of the
defendant's right."  *Commonwealth* v. *Jones*, 362 Mass. 497, 503 (1972).
See *Commonwealth* v. *Monosson*, 351 Mass. 327, 329-330 (1966).  In
*Selectmen of Framingham* v. *Municipal Court of the City of Boston*, 373
Mass. 783, 786-788 (1977), we ruled that, "as matter of Massachusetts
law, even though it may not be required by the Federal Constitution,"
evidence seized from a police officer's home in violation of the Fourth
Amendment and art. 14 was not admissible in an administrative hearing
to remove the officer.

3. Because they may arise at a retrial of the defendant, we comment on two other issues raised by the defendant. There is no basis for reversal of the conviction on the ground that the judge abused his discretion in denying the defendant's motion that, if he were to testify, the Commonwealth should be barred from using certain prior convictions, pursuant to G. L. c. 233, § 21, for the purpose of impeachment. See *Commonwealth* v. *Diaz*, 383 Mass. 73, 78-80 (1981). Nor was there error in denying the defendant's request that he be allowed to make a sworn or an unsworn statement to the jury at the close of the evidence. The matter was within the judge's discretion. *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 95-96 (1973). The defendant has made no showing of an abuse of discretion.

> *Judgment reversed.*
> *Verdict set aside.*

LIACOS, J. (concurring, with whom Abrams, J., joins). While I agree with the result reached by the court, I cannot join in that portion of the opinion of the plurality of the court (part 2) which treats the issue of the admissibility of evidence seized under a warrant admittedly defective.

My disagreement is specifically directed to the grudging acceptance of the exclusionary rule displayed by Justice Wilkins in his discussion of the law and the facts. Cf. *Commonwealth* v. *Loughlin*, 385 Mass. 60, 63 n.3 (1982) ("Doubt about the wisdom of the views of the Supreme Court . . . on the subject of illegal searches and seizures . . . hardly justifies ignoring those views when Fourth Amendment issues are raised in this court"). Moreover, the discussion by the plurality opinion does not accurately reflect either the facts of this case or the relevant legal principles. The plurality initially describes the question involved as one that is both "serious and challenging," because it deals with a "police search conducted in good faith." *Supra* at 488-489. Further, the plurality describes the issue as "whether an er-

ror of a magistrate, unrelated to police error, calls for the application of the exclusionary rule." *Supra* at 503. The plurality then characterizes the error of the magistrate as one that occurred "negligently but in good faith" and as one not "rising above the level of negligence." *Supra* at 503-504.

It is clear and established law that a warrant, albeit based on probable cause, must specifically describe the premises to be searched and the objects to be seized in order to be a valid basis of a search. *Ybarra* v. *Illinois,* 444 U.S. 85, 92 n.4 (1979). *Lo-Ji Sales* v. *New York,* 442 U.S. 319 (1979). *Stanford* v. *Texas,* 379 U.S. 476 (1965). *Marcus* v. *Search Warrant of Property at 104 E. Tenth St., Kansas City, Mo.,* 367 U.S. 717 (1961). *Marron* v. *United States,* 275 U.S. 192, 196 (1927). *Commonwealth* v. *Smith,* 370 Mass. 335, cert. denied, 429 U.S. 944 (1976). *Commonwealth* v. *Hall,* 366 Mass. 790 (1975). The warrant herein had no reference whatsoever to the items sought to be seized, contrary to the requirements of the Fourth Amendment to the United States Constitution, art. 14 of the Declaration of Rights, and G. L. c. 276, § 2. Yet the plurality seeks to minimize this violation because of the alleged "good faith" of a magistrate in issuing this grossly defective warrant.

The motion judge ruled, and a majority of the court agrees, the search warrant was constitutionally defective and in violation of Federal and State law because it did not describe with particularity the items sought in the search.[1] *Supra* at 489. See generally *supra* at 500 n.10. The court then concludes that the exclusionary rule requires the suppression of the evidence seized pursuant to the search warrant. Because, however, the plurality finds it necessary to engage in a gratuitous discussion of the wisdom of the rule in this instance, I am compelled to state my views on this issue.

---

[1] "Such particularity is necessary in order to identify . . . the things to be seized; it both defines and limits the scope of the search and seizure, thereby protecting individuals from general searches, which was the vice of the pre-Revolution writs of assistance." *Commonwealth* v. *Pope,* 354 Mass. 625, 629 (1968).

I point out first that nowhere in the judge's written find-
ings is there a finding that the actions of the magistrate were
merely negligent. Indeed, while the judge viewed the
police as having acted in good faith,[2] at the hearing on the
motion he characterized the actions of the magistrate in
these terms: "I saw this search warrant, and when I saw it
I had to put my glasses on because I had not seen anything
like that before. . . . [T]his warrant is so inappropriate [as]
to be plainly unconstitutional," under the State and Federal
Constitutions.[3] The judge viewed the warrant as a "general
warrant" akin to the colonial "writs of assistance" which led
to the enactment of art. 14 of the Massachusetts Constitu-
tion and the Fourth Amendment. He regarded the warrant
as one that "flies right in the face of the Constitution." He
characterized the magistrate's issuance of this warrant as a
"judicial blunder." In describing the warrant, he stated he
had "never seen anything so plainly on its face a nullity."

A reading of the search warrant in this case reveals that
the judge's views were not unduly harsh.[4] Although the
plurality agrees that the warrant nowhere described the
things the police sought to seize and was thus unconstitu-
tional, the plurality's view of the magistrate's error as being
merely one of negligent good faith is supported neither by
the record nor the findings of the motion judge. A proper
legal definition of "good faith" involves not only a lack of
malevolence,[5] but also a reasonable effort to comply with
the law. One commentator has defined the good faith "ex-
ception" as follows: "[W]hen an officer acts in the good
faith belief that his conduct is constitutional *and where he
has a reasonable basis for that belief*, the exclusionary rule
will not operate" (emphasis added). Ball, Good Faith and

---

[2] I shall comment further on this point.

[3] The judge also viewed the warrant as defective under G. L. c. 276,
§§ 2, 2A.

[4] The warrant used in this murder investigation is reproduced as an ap-
pendix to this opinion.

[5] I do not view the conduct of the magistrate, the police, or the office of
the district attorney as malevolent.

the Fourth Amendment: The "Reasonable" Exception to the Exclusionary Rule, 69 J. Crim. L. & Criminology 635, 635 (1978). See *United States* v. *Williams*, 622 F.2d 830, 841 & n.4a (5th Cir. 1980) (en banc) (alternative holding), cert. denied, 449 U.S. 1127 (1981) (recognizing that reasonable good faith exception must be grounded on an objective reasonableness). Cf. *Commonwealth* v. *Sherry*, 386 Mass. 682, 697 (1982) (mistake of fact defense requires an objective standard of reasonableness); *Commonwealth* v. *Huffman*, 385 Mass. 122, 126 (1982) (whether "exigent circumstances" present based on objective view of totality of circumstances). The magistrate who utterly fails to describe or even attempt to describe the things to be seized under the search warrant has not made a reasonable effort to comply with the law. Compare *Commonwealth* v. *Rugaber*, 369 Mass. 765 (1976).[6] This is not a case of mere accidental violation of constitutional commands.

I turn now to the conduct of the police, which both the motion judge and the plurality find to have been in "good faith." At the outset, it should be emphasized that an effort to characterize police conduct here as in "good faith" is again neither factually nor legally accurate. The evidence is undisputed that the officer seeking the warrant was an experienced officer who had been on the force for nineteen years, ten of which were as a detective. Other experienced officers were also present. Additionally, the district attorney reviewed the application typed by this officer, and the first assistant district attorney was present at the home of the magistrate when the warrant was issued. It is also undisputed that the form of the warrant used was that used

---

[6] The plurality points out what, assumably, it believes to be the extenuating circumstances surrounding the issuance of this warrant. In my estimation, however, because everyone involved knew that they were dealing with an improper "form" warrant that had to be adapted to fit their purposes, extra care should have been taken to ensure that the warrant read properly. Thus, I would hold the officers and the magistrate to a higher standard of good faith based on the circumstances in this case which put them on notice that a defective warrant could easily be issued if proper care were not taken.

under a narcotics statute repealed about eight years earlier. See G. L. c. 94, § 213, repealed by St. 1971, c. 1071, § 2 (now G. L. c. 94C, the Controlled Substances Act). All present at the magistrate's home knew that the form warrant given to the judge was defective in form and substance. According to those present, the judge made only two alterations in this warrant,[7] by changing the caption as to the issuing court and the name of the issuing magistrate.

Even if one puts aside the police officer's experience, there is no justification in treating the "police" separately from the first assistant district attorney, a trained and experienced prosecutor. See *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261 n.8 (1980) (police are also part of prosecution). To take the position that these law enforcement personnel acted in "good faith" is simply to say that no showing of evil intent has been proved. It cannot be said, however, that they acted reasonably when the officers, knowing from the start that the form warrant was improper, apparently never even read the warrant. Their acquiescence in the acts of the magistrate cannot be viewed as "good faith." The plurality's condonation of this default of responsibility by law enforcement personnel is particularly troubling.[8] In using the approach it has taken, the plurality turns its back on the teaching of history and opens the door to the return of general warrants and writs of assistance.

1. *Judicial error.* Assuming, as does the plurality opinion, that what is involved in this case is not police error but rather judicial error, the plurality points to no cases wherein the supposed good faith but negligent act of a judge who

---

[7] The testimony of the officer who sought the warrant was that the visit with the judge took approximately twenty-five minutes with only three or four minutes to change the form.

[8] The plurality also stresses that the search, as actually carried out, was within the limits that the police understood the warrant to permit, *supra* at 503, and, in any event, the occupants of the defendant's household did not actually read the warrant, *supra* at 494. Both of these factors appear to be irrelevant in light of our recent decision in *Commonwealth* v. *Taylor*, 383 Mass. 272, 277-278 (1981).

issues a defective warrant is relevant in determining whether the evidence should be suppressed. As the appellate court of last resort in this State, our primary concern is to correct judicial error in all stages of a proceeding. I fail to understand why the "good faith" of a judge should make any difference in this case. Do we not always assume that the judges of all the various courts throughout the Commonwealth carry out their duties in good faith? If our standard of review is to be limited to examining the good faith of the judge, few cases would require reversal, and errors of law would stand uncorrected.

The plurality opinion appears to recognize that suppression of illegally seized evidence may encourage greater care by magistrates in the future, but expresses doubt as to the efficacy of such a rule in deterring judicial error. I strongly disagree with the plurality's reasoning on this point. Our responsibility as the court of last resort in this Commonwealth requires that judicial violations of the Fourth Amendment find no sanction, express or implied, in our opinions. Unless this court "safeguards its own capacity to function and to preserve the security of its people, society itself could become so disordered that all rights and liberties would be endangered." *United States* v. *United States Dist. Court for the E. Dist. of Mich.*, 407 U.S. 297, 312 (1972). The language in today's opinion will hardly encourage greater care by judges who issue search warrants. Indeed, the language of the plurality cannot but encourage negligent behavior, a hardly laudable characteristic of judicial conduct. Common sense tells me that greater care will be encouraged if the rule remains as it is, viz., evidence seized under an invalid warrant will be suppressed.

2. *Prior Federal precedent.* Acknowledging, as the plurality does, that the exclusionary rule has not been applied in all circumstances by the Supreme Court of the United States, does not answer the question whether it should be applied in this instance. Admittedly, the Supreme Court has refused to extend the exclusionary rule beyond that established in *Mapp* v. *Ohio*, 367 U.S. 643

(1961). See *Alderman* v. *United States*, 394 U.S. 165, 175 (1969). See also, cases cited by the plurality, *supra* at 501 n.13. The Supreme Court, however, has continued to apply "judicially created means of effectuating the rights secured by the Fourth Amendment." *Stone* v. *Powell*, 428 U.S. 465, 482 (1976). Even those on the Supreme Court who have criticised the exclusionary rule have recognized that the rule should not be eliminated, absent a satisfactory alternative means of protecting Fourth Amendment values. Thus, despite the minority views cited by the plurality opinion, the Supreme Court has not taken the step the plurality appears to favor. Indeed, there is some recent indication that the Court would not accept a good faith exception to the exclusionary rule. See *Taylor* v. *Alabama*, 457 U.S. 687, 693 (1982) (expressly rejecting any good faith exception to exclusion of confession that was fruit of an illegal arrest).

The cases that have discussed a good faith exception to the exclusionary rule are significant to the points I have made. See *Michigan* v. *DeFillippo*, 443 U.S. 31 (1979); *United States* v. *Peltier*, 422 U.S. 531 (1975). In the *Peltier* case, the Court allowed admission of evidence obtained from a search and seizure where the officers had conducted the search in good faith reliance "upon a validly enacted statute, supported by longstanding administrative regulations and continuous judicial approval." *Id.* at 541. Similarly, in *DeFillippo, supra,* the Court allowed admission of evidence seized pursuant to an arrest under an ordinance which was subsequently found invalid. So long as "the arrest was valid when made, the search was valid and the [contraband was] admissible in evidence." 443 U.S. at 36. In both *Peltier* and *DeFillippo,* the *searches were valid* under the then existing law, and, more importantly, there were no search warrants involved. In the instant case, the search was invalid from the beginning.[9] It is one thing to consider

---

[9]The plurality's reference to the "good faith" exception relied on in *United States* v. *Williams*, 622 F.2d 830 (5th Cir. 1980) (en banc), cert.

the reasonable good faith of law enforcement officials who proceed according to then existing legal standards that are later changed, and another to consider, in hindsight, the good intentions of a judge who issued a clearly defective warrant that was invalid at the time issued and is still invalid today. "[C]learly there is a crucial distinction between withholding [the exclusionary rule's] cover from individuals whose Fourth Amendment rights have not been violated — as has been done in the 'standing' cases, . . . *Jones* v. *United States*, 362 U.S. 257 (1960) — and withdrawing its cover from persons whose Fourth Amendment rights have in fact been abridged." *United States* v. *Calandra*, 414 U.S. 338, 364-365 (1974) (Brennan, J., dissenting).

Even assuming that there was a good faith exception for judicial error, it would not apply in this case. Permeating the plurality opinion is the assumption, which is plainly stated at one point in the text, *supra* at 503-504 that the

---

denied, 449 U.S. 1127 (1981), is less than illuminating. The court in *Williams* stated: "No warrant is involved here, hence nothing that we say applies to factual situations where one has been obtained." *Id.* at 840 n.1. Additionally, the *Williams* majority made it clear that good faith alone was not sufficient; the officer's acts had to be "reasonable" as well. *Id.* at 841 n.4a. No justification can be found in *Williams* for applying its principle to negligent acts, such as are here involved.

The decision in *Williams* was "unusual." *Abell* v. *Commonwealth*, 221 Va. 607, 616 (1980). Sixteen members of the twenty-four judge court held that evidence seized incident to an arrest should not be suppressed because the arrest was valid. 622 F.2d at 839. Thirteen members of the court, including some of those who joined in the first holding, united in an alternative holding that, even if the arrest were invalid, the exclusionary rule would not be applied because the officer acted under a *reasonable* good faith belief that the arrest was lawful. *Id.* at 846-847. Ten judges, in a concurring opinion, including some of those who joined in the first holding, objected to the majority's alternative holding. The concurrers chastised the court for lack of judicial restraint in writing an alternative holding not necessary to resolve the case, as the entire court agreed that the arrest was valid. The concurrers also asserted that the conclusions reached by the court in the second holding were supported only by dissenting opinions and law review articles. The *Williams* case has had, at best, a sparse following. Most importantly, the *Williams* court was dealing with reasonable conduct, not the kind of conduct here involved.

judge acted "negligently but in good faith." This is a contradiction in terms. The plurality acknowledges that the judge's error "was a serious omission of constitutional significance." *Supra* at 504 n.17. In the circumstances of this case, such error stemmed from a failure on the part of the judge to exercise reasonable care in issuing the warrant. Obviously, the judge did not read the warrant before handing it over to the police. Such behavior cannot be characterized as "good faith." Indeed, Justice Rehnquist, the most vehement critic of the exclusionary rule on the Supreme Court of the United States, has recognized that the deterrent function of the exclusionary rule is served by proscribing negligent as well as wilful behavior: "The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." *Michigan* v. *Tucker*, 417 U.S. 433, 447 (1974). In order to be viewed as being in good faith, official action, though later proved to be erroneous, must have been undertaken with a greater degree of care than was exhibited in this case. See note 6, *supra.*

The recent opinions questioning the purposes and functions of the exclusionary rule, as it applies to good faith errors by arresting or searching officers, stress the problems that the exclusionary rule "poses to the policemen who must act on the firing line (unfortunately too often literally so) and under the need to make immediate law enforcement decisions without the luxury of deliberation." *United States* v. *Santucci*, 509 F. Supp. 177, 182 (N.D. Ill. 1981), rev'd on other grounds, 674 F.2d 624 (7th Cir. 1982). The pressures of law enforcement cannot serve as an adequate basis for excusing judicial error. Cf. *Santucci, supra* at 182-183

(United States Attorney cannot invoke "policemen in the field" good faith exception to the exclusionary rule).

3. *Judicial integrity.* Although the plurality opinion asserts that the notion of preservation of "judicial integrity fails as a substantial, independent support for the [exclusionary] rule," *supra* at 502, it fails to address adequately whether the imperative of judicial integrity, in this particular instance, would support invocation of the exclusionary rule. See *Stone* v. *Powell, supra* at 485 (judicial integrity has limited role in determining whether to apply exclusionary rule *in a particular context*). "The primary meaning of 'judicial integrity' in the context of evidentiary rules is that the courts must not commit or encourage violations of the Constitution." *United States* v. *Janis,* 428 U.S. 433, 458-459 n.35 (1976).

One need only turn to history to recognize the dangers to society if the judiciary cannot, or will not, diligently and carefully protect the rights of individuals. See Marsh, Some Aspects of the German Legal System Under National Socialism, 62 Law Q. Rev. 366 (1946); Roetter, The Impact of Nazi Law, 1945 Wis. L. Rev. 516. See also *Korematsu* v. *United States,* 323 U.S. 214 (1944); L. Tribe, American Constitutional Law 1000 (1978).

The imperative of judicial integrity strikes me as being at the very core of Fourth Amendment values. It is appropriate to note, in this context, the impressive words of the Constitution of the Union of Soviet Socialist Republics:

> "Article 55. Citizens of the USSR are guaranteed inviolability of the home. No one may, without lawful grounds, enter a home against the will of those residing in it.
>
> "Article 56. The privacy of citizens, and of their correspondence, telephone conversations, and telegraphic communications is protected by law.
>
> "Article 57. Respect for the individual and protection of the rights and freedoms of citizens are the duty of all state bodies, public organisations, and officials.

"Citizens of the USSR have the right to protection by the courts against encroachments on their honour and reputation, life and health, and personal freedom and property."

Constitution of the Union of the Soviet Socialist Republics, in 16 Constitutions of the Countries of the World 29 (A. Blaustein & G. Flanz eds. 1982).

We take for granted the meaningless nature of these words because the courts of that nation cannot, or will not, implement them to protect the rights of their citizens. In contrast, John Adams said of James Otis's argument against the colonial writs of assistance that "[t]hen and there was the first scene of the first Act of Opposition to the arbitrary Claims of Great Britain. Then and there the child Independence was born." 2 Legal Papers of John Adams 107 (L. Wroth & H. Zobel eds. 1965).

In this case, the goal of preserving judicial integrity is a sufficient justification for applying the exclusionary rule, since it is a judge who committed the violation. "It is the duty of [judges] to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd* v. *United States*, 116 U.S. 616, 635 (1886).

What becomes of judicial integrity when three members of this court appear to condone the egregious judicial error involved in this case? And what is left of the most significant protection embedded at the core of the Fourth Amendment and art. 14 values, namely the role of a neutral and detached magistrate in determining the validity and terms of a search? See *Lo-Ji Sales* v. *New York*, 442 U.S. 319 (1979); *Connally* v. *Georgia*, 429 U.S. 245 (1977); *Shadwick* v. *Tampa*, 407 U.S. 345 (1972); *Coolidge* v. *New Hampshire*, 403 U.S. 443 (1971). The crucial role of a magistrate is to determine whether probable cause for a search warrant exists and, just as importantly, to describe with particularity the place to be searched and the things to be seized. *Stanford* v. *Texas*, 379 U.S. 476 (1965). *Marcus* v. *Search*

*Warrant of Property at 104 E. Tenth St., Kansas City, Mo.,* 367 U.S. 717 (1961).[10]

The particularity requirements of the Fourth Amendment are "precise and clear. They reflect the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." *Stanford* v. *Texas, supra* at 481. In the instant case, the plurality condones "a manifest neglect if not an open defiance of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action." *Weeks* v. *United States,* 232 U.S. 383, 394 (1914). Although "[t]he criminal goes free, if he must, . . . it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence." *Mapp* v. *Ohio,* 367 U.S. at 659.

The language the plurality opinion uses in reaching the correct result mandated by State and Federal law does unnecessary harm to a body of law now well-established in our jurisprudence. The case is "serious" but there is nothing "challenging" about this issue except the plurality's unnecessary and unhappy incursion into a field of law well rooted in American history. One cannot but wonder as to the purpose of such treatment of an issue so clear cut. It would be well to keep in mind that what was involved here is a search of a home, the most sacrosanct of places under Fourth Amendment jurisprudence. "The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home — a zone that finds its roots in clear and specific constitutional terms: 'The right of the

---

[10] One should not have to add that, in every one of the decisions cited here which involves a defective warrant issued by a magistrate, the fruits of the search conducted under the authority of the defective warrant were suppressed.

people to be secure in their . . . houses . . . shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman* v. *United States*, 365 U.S. 505, 511 [1961]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *Payton* v. *New York*, 445 U.S. 573, 589-590 (1980). The violations of the Fourth Amendment and our State laws involved here were not merely "negligent." They were inexcusable.[11] The warrant was clearly defective. The search of this dwelling was as though without a warrant. The evidence illegally obtained as a result must be suppressed without question.

---

[11] I point out also that despite the plurality's attempt to excuse the conduct here on the ground that the defendant was "at liberty" (*supra* at 497) and that there was need for "prompt action" (*supra* at 504 n.17), the evidence shows that an arrest warrant had been issued for the defendant, and that the police knew he was not at home and dispatched a team of officers who arrested him at another place at the same time the search under the defective warrant was conducted.

Commonwealth *v.* Sheppard.

## APPENDIX

To the Justices of the Municipal Court of the ~~Dorchester~~ ROXBURY District                    , holden in said
Dorchester District for the transaction of criminal business within the County of Suffolk:

_____ of Boston _____
in the County of Suffolk, Police Officer, on oath informs the said Court, that he has reason to believe
that any controlled substance, article, implement or other paraphernalia used in, for, or in connec-
tion with the unlawful possession or use of any controlled substance, is kept or deposited by _____

____OSBORNE SHEPPARD_____*some person or persons unknown to the said*

_____*in certain rooms in the* __2 ND & BASEMENT
story of the building situated and numbered____ 42 _____
in· __DECKARD ST., _____ street
in said city and within the judicial district of said Court and prays a Warrant to search there for
the same.

RECEIVED and sworn to before this Court, this _____6 TH_____ day of
____MAY_____. in the year of our Lord one thousand nine hundred and seventy ____NINE____

Clerk.

## Commonwealth of Massachusetts

SUFFOLK, TO WIT:

To the Sheriff of our County of Suffolk, his Deputies, and the Constables and
Police Officers of the City of Boston in said County:        GREETING.

WE COMMAND YOU, and each of you forthwith, with necessary and proper assistants, to enter
in the day time or in the night time in the _____
mentioned in the above information, and there diligently to search for any controlled substance,
article, implement or other paraphernalia used in, for, or in connection with the unlawful possession
or use of any controlled substance, and to seize and securely keep the same until final action, and
to arrest the person or persons in whose possession it is found, together with all persons present if
any of the aforesaid substances is found, and bring them before said Court to be dealt with according
to law, and return this warrant with your doings thereon.

You are also commanded, in like manner, to notify the informant to appear and give evidence
touching the matter contained in the above complaint, when and where you have the said substances
and persons or either of them.

JOSEPH F. FEEHEY           MASS. TRIAL COURT
ROXBURY DIVISION
WITNESS, ~~PAUL H. KING~~, Esquire, at Boston, in said ~~Dorchester District~~, this

SIXTH _____ day of ____MAY_____
in the year of our Lord one thousand nine hundred and seventy____ NINE.

_____ Clerk
_____, Mass. Trial Court

FOR. 31966 HOBBS & WARREN. INC.

LYNCH, J. (dissenting). It is undisputed that the search warrant used in this case to seize highly probative evidence linking the defendant to the murder of Sandra Boulware was formally defective. At issue in this appeal is the question whether the failure of the issuing magistrate to include in a search warrant, issued on probable cause, a list of the items to be seized or to incorporate such a list by reference to the police affidavit necessitates the application of the exclusionary rule where the search and seizure is limited to the items described in the affidavit. This court has concluded that the decisions of the United States Supreme Court mandate suppression of this evidence. *Supra* at 489, 509. I believe, however, that the majority's conclusion represents a misreading of the relevant Supreme Court precedent and that its application of the exclusionary rule is inappropriate on the facts in this case. Accordingly, I dissent. I believe that a careful exploration of the purposes behind both the particularity requirement of the Fourth Amendment to the United States Constitution, which the police and judge inadvertently violated here, and the exclusionary rule demonstrates that the trial judge's admission of this evidence was proper on these facts.

The Supreme Court has noted that the particularity requirement was included in the Fourth Amendment to protect citizens from the general warrants and writs of assistance that were commonly used by the British against the colonists. *Boyd* v. *United States*, 116 U.S. 616, 624-627 (1886). These general warrants granted British officers unbridled discretion to search the place and belongings of the colonists and placed "the liberty of every man in the hands of every petty officer." *Id.* at 625. See also *Marron* v. *United States*, 275 U.S. 192, 195-196 (1927). The particularity requirement of the Fourth Amendment is directed at this specific evil. It requires that those searches that are deemed necessary should be as limited as possible: "[T]he problem is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings." *Coolidge* v. *New Hampshire*, 403 U.S. 443, 467 (1971). Also, evi-

dence seized under a general warrant is unlikely to be supported by probable cause. Specificity in the warrant limits the potential for such abuse. *Id.*

In the present case none of the evils associated with searches under such warrants occurred. At all times, Detective O'Malley and his colleagues conducted their search for evidence in a manner that scrupulously adhered to the limits that were specified in the affidavit and that they believed in good faith the judge had authorized. The police searched only in the places particularly described in the warrant and they seized only the relevant murder evidence described in Detective O'Malley's affidavit. They neither assumed nor exercised any discretion in the search. The police officers sought prompt judicial approval for their search warrant and searched no further than specified in the affidavit. No "rummaging" among the defendant's belongings occurred. In the face of the dedication shown by these police officers to the spirit and purposes of the Fourth Amendment, abstract fears of "general warrants" and "writs of assistance" are completely misplaced.

More importantly, even conceding that the detective's carrying the affidavit on his person rather than attaching it to the warrant rendered the warrant formally defective, I believe that application of the exclusionary rule to suppress the evidence seized brings about too harsh a result. The plurality opinion correctly points out that the substantial, and perhaps only, justification for the exclusionary rule relied upon by a majority of the Justices of the Supreme Court is the goal of deterring unconstitutional conduct by the police and other law enforcement personnel. *Supra* at 502. The plurality opinion also recognizes the existence of factors in this case which, in my opinion, militate against the application of the exclusionary rule. That opinion acknowledges that the police conducted the search in a good faith belief, reasonably held, that the search was lawful and authorized by the warrant issued by the judge; the defect in the warrant was not harmful to the defendant in the circumstances of the actual search; the search was conducted

in the same way and with the same results as it would have been conducted if the warrant had not been defective; the error in the warrant consisted of the judge's failure, negligently but in good faith, to strike out certain clearly inapplicable words printed on the blank form and to attach to it (or to incorporate by reference to the affidavit) a list of the items to be seized; the Supreme Court has not applied the exclusionary rule to a judge's error in such circumstances; there may be reasonable distinctions between police misconduct and the errors of magistrates; the judge's conduct was neutral and detached; he did not undertake the role of the police and become concerned with ferreting out crime; the exclusionary rule is not well tailored toward deterring judicial misconduct since the suppression of a particular piece of evidence may not be as effective a disincentive to a neutral judge as it would be to the police; the defendant was not prejudiced by the magistrate's error; and various members of the Supreme Court have made statements critical of the application of the exclusionary rule in particular circumstances (not unlike those found to exist here). *Supra* at 503-506. The majority nevertheless concluded that the exclusionary rule requires the suppression of the evidence seized. I believe that the factors summarized above, which three members of this court apparently agree are of significance, compel the conclusion that the evidence seized at 42 Deckard Street need not be suppressed under the United States or the Massachusetts Constitution.

The Supreme Court has noted with concern that "[e]ach time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights. Relevant and reliable evidence is kept from the trier of fact and the search for truth at trial is deflected." *Rakas* v. *Illinois,* 439 U.S. 128, 137 (1978). Frequently the evidence sought to be excluded is "the most probative information bearing on the guilt or innocence of the defendant." *Stone* v. *Powell,* 428 U.S. 465, 490 (1976). Consequently, "[a]pplication of the [exclusionary] rule . . . deflects the

truthfinding process and often frees the guilty. The [resulting] disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice." *Id.* at 490-491.

To minimize the social cost resulting from the indiscriminate application of the exclusionary rule, the Supreme Court has held that this judicially made rule is not coextensive with the Fourth Amendment. *Stone* v. *Powell, supra* at 486, 488-489. *United States* v. *Calandra,* 414 U.S. 338, 347-348 (1974). Rather than applying the exclusionary rule reflexively, the Court has stated that judges should weigh the value of deterrence of police misconduct gained in applying the rule against the "further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Stone* v. *Powell, supra,* quoting from *Alderman* v. *United States,* 394 U.S. 165, 175 (1969).

Thus, it is clear that the policies underlying the exclusionary rule are not absolute and they must be evaluated in light of competing considerations: "As with any remedial device, the application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Calandra, supra* at 348. Here, application of the exclusionary rule will serve no beneficial purpose. Police misconduct will not be deterred because none occurred. The human error committed by the judge harmed no rights of the defendant, as nothing beyond the evidence listed in the affidavit was searched for or seized. By contrast, application of the exclusionary rule

will result in the very substantial harm of withdrawing highly probative evidence from the trier of fact.

In discussing the need for applying the exclusionary rule under the Fifth Amendment to the Constitution of the United States, the Supreme Court has cautioned that before we penalize official misconduct we must consider whether the sanction serves a valid and useful purpose. *Michigan* v. *Tucker,* 417 U.S. 433, 446 (1974). I can perceive no valid and useful purpose for applying the exclusionary rule to the good faith search and seizure performed by the police here, albeit under a defective warrant. The failure of the judge or the police to attach the affidavit to the revised warrant form was merely a harmless error, but under the majority's holding the consequences are Draconian: for want of a staple, highly probative evidence is lost. Such dedication to rigid formality is commanded neither by the Constitution nor by logic. I respectfully dissent.