Morris WELLS, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

Supreme Court of Kentucky.

Jan. 10, 1978.

Rehearing Denied April 11, 1978.

L. Owen Doyle, Paintsville, Dan Jack Combs, Pikeville, for appellant.

Robert F. Stephens, Atty. Gen., James L. Dickinson, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Chief Justice.

Morris Wells appeals from a judgment entered pursuant to a jury verdict finding him guilty of murder and fixing his punishment at life imprisonment. KRS 507.020.

The indictment was returned on July 9, 1975. It accused Wells of having shot and killed one James Byrge on or about June 22, 1975. Though for some unaccountable reason the record on appeal does not contain any of the orders relating to it,[1] other references in the transcript of evidence and briefs disclose that the first trial of the case took place in August of 1975 and ended in a hung jury. The second trial, now under review, was held in November of 1976. The significance of this hiatus is that Mary Wells, a material witness for the prosecution, who was divorced from Wells at the time of the first trial, remarried him before the second trial and asserted her privilege not to testify against him in the latter proceeding, cf. KRS 421.210, thus precipitating what we consider to be the major question raised by the appeal.

It is not necessary to state the facts of the case in great detail. Morris and Mary Wells, after some 12 years of marriage, were divorced in January of 1975. Soon thereafter Mary moved from Winchester, where she and Morris and their two children had resided, to Paintsville. Meanwhile, following the divorce Mary had been seeing Jim Byrge and they were planning to be married. On the night of June 21, 1975, Mary, Jim and Mary's daughter Peggy attended a ball game in which Mary's son Gary participated. Afterward, all four went to Mary's apartment in Paintsville. At some time after midnight Morris Wells, armed with a pistol, forced his way into the apartment and engaged in a gun-fight with Jim Byrge. Byrge was mortally wounded.

Mary's testimony at the first trial made it abundantly clear that Morris Wells was the aggressor in the fatal encounter. At the second trial, when she claimed the veil of privilege as his wife, the trial court, over objection of counsel for Morris, permitted the Commonwealth to read into the evidence her testimony given at the first trial.

KRS 422.150 provides that the testimony of a witness recorded at a trial may under appropriate circumstances be used as evidence in a subsequent trial, but that "no testimony so taken shall be used in any criminal case without the consent of the defendant." It is a very old statute.[2] Quite obviously it originated in an era when the constitutional legitimacy of this type of evidence was viewed with considerable skepticism. Even before the advent of our Rules of Criminal Procedure,[3] the court was carving from it exceptions deemed essential to consist with simple justice. Cf. *Fuqua v. Commonwealth*, 118 Ky. 578, 81 S.W. 923, 924–925 (1904), in which the proscription against use without consent of the defendant in a criminal case was limited to the

---

1. RCr 12.56 (now superseded by CR 75.07) directs the trial court clerk to prepare and certify "the entire original record on file in his office, other than depositions not read in evidence," etc.

2. See Ch. 269, § 7, Acts of 1893.

3. The Rules of Criminal Procedure became effective on January 1, 1963.

recorded testimony of witnesses still living.[4] In 1965 RCr 7.22 placed the trial testimony of a witness on the same footing as a deposition, and in *Noe v. Commonwealth*, Ky., 396 S.W.2d 808, 810 fn. 1, it was suggested that to the extent of any inconsistency between KRS 422.150 and RCr 7.22 the Rule prevails. As it would be an utter absurdity to say that testimony given by a witness in court could *not* thereafter be used under circumstances in which, had it been taken by deposition outside the courtroom, it *could* be used, surely it must follow that the statutory proscription against its admissibility without consent of the defendant has been superseded by the procedural rules applicable to depositions and can no longer be regarded as having any practical or legal effect.[5]

■ It is further contended, however, that even under the Rules of Criminal Procedure the previous testimony of a witness still living, physically capable of testifying, and present within the jurisdiction cannot be admitted as evidence in chief. Literally, this would appear to be so, because in enumerating the circumstances under which a deposition may be used RCr 7.20(1) expressly mentions only the following: (1) That the witness is dead; (2) that the witness is absent from the state (unless such absence was procured by the party offering his testimony); (3) that the witness is unable to attend or testify by reason of sickness or infirmity; and (4) that the party offering the deposition has been unable to reach the witness by subpoena. We think, however, that the Rule is not to be so narrowly construed. Its clear purpose is to preserve the evidence against the event of the witness' becoming unavailable to testify. This witness, Mary Wells, though living and present, was just as unavailable to the Commonwealth as if she had been dead or out of the state.

"The general principle upon which depositions and former testimony should be resorted to is the simple principle of *necessity* —i. e., the absence of any other means of utilizing the witness' knowledge. If his testimony given anew in court cannot be had, it will be lost entirely for the purposes of doing justice if it is not received in the form in which it survives and can be had. The only inquiry, then, need be: Is his testimony unavailable?" Wigmore on Evidence, § 1402 (Chadbourne Rev.1974).

"A disqualification by subsequently acquired interest or the exercise of privilege makes the witness' present testimony unavailable, and hence should suffice to allow resort to his deposition or former testimony. This doctrine was not accepted in early English common-law practice; which was followed by our courts in a few instances. But it was well established in English Chancery practice, and this would probably be generally followed in our courts." Id., § 1409.

■ At its very best, the rule that one party to a marriage cannot be compelled to testify against the other, codified in KRS 421.210, is one of the most ill-founded precepts to be found in the common law. It is enough that it continues to exist at all. When it is encountered it is better to be trimmed than enlarged. Least of all should it be allowed as a gambit to expunge evidence that was perfectly proper and admissible when given. We need not say, of course, that Mary Wells could or should have been compelled to testify at the second trial, but what we do hold is that neither she nor her husband could prevent the use of testimony given by her at a time when she did not have the privilege.

■ The other claims of error are of less gravity. Whether the search that produced the pistol used by Wells in shooting Byrge was proper is immaterial for the simple

---

4. See also the later cases cited in *Commonwealth v. Bugg*, Ky., 514 S.W.2d 119, 120 (1974). In *Bugg*, the previous testimony was held inadmissible only because RCr 7.22 limits the testimony to "the same charge in the same court."

5. *Manning v. Commonwealth*, Ky., 328 S.W.2d 421, 425 (1959), was decided prior to the adoption of the Rules of Criminal Procedure.

reason that the evidence in question was not prejudicial anyway. That Wells shot Byrge was proved by such a superabundance of evidence that no competent juror could have doubted it. The case would have been equally strong without the gun. If the search was unlawful, which we do not decide, the error in admitting the evidence was harmless beyond a reasonable doubt.

We think it was plainly in error for the trial court to strike the evidence of the character-witnesses Conley and Pierce on the apparent basis that under cross-examination they could not supply the name or names of anyone they had heard discuss Wells' reputation. Again, however, we cannot believe that this testimony, which the jurors, after hearing it, were admonished not to consider, had any substantial bearing on the verdict.

The special prosecutor's characterization of the victim's "crawling away dying" and having "bloody handprints" on the floor, though not literally supported by any evidence to that effect, did not sufficiently differ from what did happen, according to the testimony of Mary Wells, to justify a reversal on that ground. It was just about as bad no matter how it might have been cast in flights and figures of speech. We think there is very little likelihood that this forensic display could have conjured in the minds of the jurors any visions different from what they had perceived from the evidence.

The judgment is affirmed.

All concur.