Gregory K. RICHMOND, Movant,

v.

COMMONWEALTH of Kentucky,
Respondent.

Supreme Court of Kentucky.

Aug. 31, 1982.

Patrick M. Flannery, Covington, Nancy Calloway, Bowling Green, for movant.

Steven L. Beshear, Atty. Gen., Penny R. Warren, Asst. Atty. Gen., Frankfort, for respondent.

J. Vincent Aprile II, Asst. Deputy Public Advocate, Frankfort, for amicus curiae.

PALMORE, Chief Justice.

Gregory (Greg) Richmond was convicted of possessing with intent to sell a Schedule II narcotic drug (cocaine) and was sentenced to 10 years' imprisonment and a $10,000 fine. KRS 218A.070, 218A.990(1). The judgment was affirmed by the Court of Appeals and comes before this court pursuant to a grant of review. CR 76.20. We concur in the judgment of the Court of Appeals, but for different reasons.

During the afternoon of Saturday, February 10, 1979, a state narcotics officer, Vincent Noble, arrested one Barron Tingle at his apartment in Carrollton, Kentucky, on a narcotics charge. Through the pressure of this charge he gained Tingle's cooperation in inducing Gregory Richmond to make a sale of cocaine. Richmond worked at a store in Madison, Indiana, across the Ohio River several miles downstream from Carrollton. Tingle called the store by telephone and talked to both Richmond and his girlfriend, Kimberly (Kim) Bear, a juvenile. In the course of this conversation Kim arranged to bring three grams of cocaine to Tingle's place in Carrollton. When they arrived, Kim went in while Greg remained at the wheel of his car. Kim did not have the cocaine with her, but explained that she

was to collect the money and give it to Richmond and then bring the cocaine in. Officer Noble, the purported purchaser, pretending to be a friend of Tingle's, insisted however that he would have to inspect the material before parting with the money. The upshot of this meeting was that Kim and Richmond got cold feet and departed the scene in great haste, pursued by other officers who had been parked down the street with Richmond's car under surveillance. The chase ended when Richmond's vehicle ran into a snowbank near the river. He and Kim were taken into custody and the automobile was impounded.

At this point Kim told the officers that Greg had handed her some cocaine and at his instructions she had thrown it out when the car hit the snowbank. It was then dark, and the ground was covered by some eight inches of snow. A search of the immediate area with the aid of automobile headlights proved fruitless, but was renewed every day for the next five days while the snow was melting, and at last the sheriff found three small bags of cocaine on the ground in the area Kim had indicated to him on the night of February 10 as being about where she threw the packets from the car.

While in custody on the night of February 10, 1979, Kim gave the prosecuting authorities an affidavit stating among other things that Richmond was bringing the cocaine to Carrollton for the purpose of selling it to Tingle or a friend of Tingle's, and that she had thrown it out the window of the car at his instructions. She was then just under 18 years of age and referred to Richmond as her boyfriend. Shortly thereafter they were married.

Richmond's automobile was towed to a municipal garage or "barn" maintained for the storage of ambulances and was searched at 11:00 or 11:30 P.M. on February 10, 1979, after District Judge Dennis Fritz of the 12th Judicial District (Henry, Oldham and Trimble Counties) had come to Carrollton for the purpose of issuing a search warrant. Before sending for Judge Fritz the police officers had attempted un-

successfully to locate the district judge, circuit judge, and trial commissioner for Carroll County, which is in the 15th Judicial District.

Evidently the conditions under which the automobile search was conducted that night were not the most propitious. It was cold and the overhead lighting was not satisfactory. At least one of the officers was looking for something of greater size than the small bags of cocaine that were later discovered. In any event, the search was temporarily discontinued and the automobile was moved to a parking area where it was kept locked and within view of the police dispatcher until the search was resumed by other officers up toward noon of the next day, Sunday, February 11, 1979. In the course of this continued search one of the officers found a small plastic bag of cocaine in the area of the seat-belt housing under the passenger side of the front seat.

The case against Richmond eventually was tried in April of 1980. It had been set for trial on at least three earlier dates, but had been postponed first because Richmond found it necessary to change counsel and then because Kim became unavailable. The prosecutor resorted to the Uniform Act to Secure the Attendance of Witnesses in order to reach Kim, and in due course she was apprehended and brought into this jurisdiction in February of 1980. She retained counsel, who proceeded to make efforts to secure her release. This was accomplished, apparently, through an agreement that she would first give a deposition in order to preserve her testimony. Arrangements for the taking of her deposition were made in open court on February 20, 1980, by Kim's lawyer and counsel for the Commonwealth, with the trial judge participating. Notice by telephone (followed by written notice) was given to Richmond's attorney, who agreed on the time and place but did not consent to the taking of the deposition. The deposition was taken at the Carroll County Court House on February 25, 1980, with the trial judge presiding. Counsel for Richmond appeared and cross-examined the witness after objecting on the ground that the attorney for the Commonwealth had

not proceeded in accordance with the Rules of Criminal Procedure (RCr 7) and upon the further ground that Kim and Richmond were now husband and wife and that Richmond would claim marital privilege. See KRS 421.210(1). Kim's attorney, on the other hand, insisted on her right to testify and waived any objection she might have had. The trial judge overruled Richmond's objections and the deposition was taken. Richmond himself was not present, but it is abundantly clear that he could have been if his attorney had so chosen. Certainly his absence was not involuntary, but by choice.

When the case came on for trial Kim was present in person and by counsel but refused to testify on grounds of the Fifth Amendment and the provision of KRS 421.-210(1) that neither husband and wife "may be compelled to testify for or against the other." Over objection of counsel for Richmond the prosecution was then permitted to read Kim's deposition to the jury.

What has been narrated thus far will serve to introduce the major points of contention. The first is that the warrant to search the automobile, issued on the night of February 10, 1979, was invalid because the judge who issued it was outside the limits of his district.

Strange to say, there is no general statutory authority for the issuance of a search warrant by any officer of this state. RCr 13.10, which provides that a search warrant may be issued by a judge (originally "magistrate") or by any other officer authorized by statute was added to the Rules by our court to fill this unaccountable void prior to their becoming effective on January 1, 1963. "Because it is nowhere else codified, RCr 13.10 states the common law on issuance of search warrants." Palmore, "Status Report on the New Rules of Criminal Procedure," Kentucky State Bar Journal, January, 1963, p. 32. "RCr 13.10 is made a part of the rules for the sake of convenient reference, since it is not covered by statute. It is intended merely to restate the common law." Explanatory Comment to Rule 13.10, as carried in original LRC

publication of the Rules (1962). Clearly, therefore, RCr 13.10 is not the wellspring of authority for the issuance of warrants.

"The wording of the Fourth Amendment implies that search warrants were in familiar use when the Constitution was adopted . . . ." *Gouled v. United States,* 255 U.S. 298, 308, 41 S.Ct. 261, 264, 65 L.Ed. 647 (1921).

"From ancient times it had been customary for justices to issue warrants for the seizure of stolen property. The circumstances under which such warrants might be issued were discussed by Lord Coke and Sir Matthew Hale. They were looked upon with disfavor. As was said by Lord Camden, 'they crept into the law by imperceptible practice.'" Fraenkel, Concerning Searches and Seizures, 34 Harv. L. Rev. 361, 362 (1920–21). See also *Boyd v. U.S.,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1885).

"Search warrants were never recognized by the common law as processes which might be availed of by individuals in the course of civil proceedings, or for the maintenance of any mere private right; but their use was confined to cases of public prosecutions, instituted and pursued for the suppression of crime or the detection and punishment of criminals. Even in those cases, if we may rely on the authority of Lord Coke, their legality was formerly doubted; and Lord Camden said that they crept into the law by imperceptible practice. But their legality has long been considered to be established on the ground of public necessity, because without them felons and other malefactors would escape detection." *Robinson v. Richardson,* 79 Mass. (13 Gray) 454, 456–57 (1859).

■ In the absence of any constitutional or statutory designation of what officers may issue warrants (whether for search or arrest, or both), it has been generally assumed that judges with authority to hear criminal matters have that power.[1] All judges are, of course, "magistrates" and are "judicial officers," though the converse is not necessarily so. More importantly, the nature of their office requires judges to possess the two constitutional qualifications of neutrality and capacity to determine the existence of probable cause. Cf. *Shadwick v. City of Tampa,* 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972). Someone must have authority to issue warrants, and by virtue of that necessity we confirm that all district and circuit judges of this state have it.[2]

The absence of an explicit delegation of the power to issue warrants results in there being no readily discernible territorial restrictions with regard to the exercise of that power. As we have noted (fn. 1, supra), warrants of arrest run to the four corners of the realm; that is, a judge in Pikeville can issue a warrant for the arrest of a person in Hickman. Why, then, should he not be able to warrant the search of a place in Hickman? And if he can do this in his office at Pikeville, is there really any important end to be accomplished by drawing a line against his signing the warrant in Hickman or, for that matter, any other place in the state?

It was held in *Coleman v. Commonwealth,* 219 Ky. 139, 292 S.W. 771 (1927), that the police judge of a 6th-class city had

1. "At common law search warrants could be issued by justices of the peace . . . ." 56 C.J. *Searches and Seizures* Sec. 109 (1932). Before its repeal as of January 1, 1963, the Code of Practice in Criminal Cases, Secs. 26, 142, 312 and 328, expressly designated the officers who could issue warrants of arrest, and the form of the warrant set forth in Sec. 27 made it clear that the authority to execute the warrant extended throughout the state.

2. KRS 15.725(4) authorizes circuit court clerks to issue "criminal warrants" in the absence of all judicial officers from the county. This

would, we think, include search warrants, as it seems probable that the word "criminal" was used for the purpose of excluding the type of "administrative" or "civil" warrant that has come into use in connection with the inspection of premises to insure compliance with safety laws. See, for example, KRS 338.101 and *Yocom v. Burnette Tractor Co., Inc.,* Ky., 566 S.W.2d 755 (1978). For purposes of our analysis here, however, there is no difference. All district and circuit judges have the authority to issue warrants of any kind upon a proper showing of reasonable cause.

no authority to issue a warrant for a search and arrest to be executed outside the boundaries of the city, and in this opinion it was said that a justice of the peace in one county could not issue a valid warrant to search premises in another county; but that was before the 1975 Judicial Amendment reconstituted this state's judicial branch of government as one unified Court of Justice.

█ It is clear from Const. Sec. 109 that there is but one District Court for the entire state. Hence all of its judges are members of the same court. Const. Sec. 113(1) requires that District Court be held in each county; Sec. 113(3) provides that each judicial district shall have at least one District Judge; Sec. 117 provides that the judges and justices of the various courts within the Court of Justice shall be elected "from their respective circuits or districts"; and Sec. 122 requires a judge or justice to have resided in his district for at least two years before taking office. None of these provisions, however, implies that any judge's powers and authority are limited to the district in which he or she is elected. Indeed the provision of Const. Sec. 113(4) to the effect that in a district having only one judge "he shall be the Chief Judge" connotes that he does not have exclusive territorial jurisdiction in his district. The provisions for a chief judge do evince, of course, an expectation that district and circuit judges will usually and regularly serve within the respective districts or circuits where they are elected, but they are still members of the same court and have equal capacity to act throughout the Commonwealth, subject to the administrative authority of the respective chief judges and the Chief Justice and subject to the rule-making power of the Supreme Court.

The practical conclusion we draw from the foregoing analysis is that Judge Fritz had the authority to issue the search warrant in Carroll County.

█ Next it is contended that the contents of the affidavit submitted to Judge Fritz in support of the warrant did not contain sufficient information to show probable cause. The affidavit was given by Officer Noble, but it refers to the affidavit signed earlier by Kimberly Bear by saying that Noble had witnessed and heard her oral statement which had been reduced to affidavit form and that the "automobile mentioned in her affidavit" had been apprehended by Noble and other officers on the Ohio River bank in Carrollton "at about 6:20 P.M., with Greg Richmond and Kimberly Bear in it." Kimberly's affidavit is in the record with Noble's affidavit and the search warrant. Obviously it was in front of Judge Fritz when he read Noble's affidavit referring to it. Though not the most fastidious incorporation by reference one might expect from a corporate lawyer under more leisurely circumstances, we think the Bear affidavit was made a part of the Noble affidavit by reference, and together they provided probable cause for issuance of the warrant. To the argument that because Kimberly said she had thrown the cocaine out the window of the car there was no reason to believe there was any more of the same substance left in the car, we think the answer is that it was not necessary to believe she was telling the whole truth in that respect. Certainly the car was being used to make a delivery of cocaine, and none of it was found on the persons of Richmond or Kimberly Bear. We think there was probable cause for a search of the automobile.

█ A great flap is raised over the use of Kimberly's deposition. The only constitutional aspect of it is that Richmond was not present so as to exercise his right of confrontation when the testimony was given. As we have said, however, obviously his absence was by choice. He could have been there. It is our opinion that he waived the right of confrontation.

█ With respect to our own law, KRS 421.210(1), clearly Kimberly could not have been compelled to give the deposition had she objected. Not only, however, did she not do so, but the fact is that she insisted on testifying so that she could get out of jail and go home. Once out of jail, especially after the charges against her had been dis-

missed, she chose to renege. If she was going to avail herself of the statutory privilege, the time to do it was before she testified. After she had testified by deposition, certainly she was entitled to claim its protection against further testifying at the trial, but the effect was to make her unavailable, and thus to render her deposition admissible. The only distinction between this case and *Wells v. Commonwealth,* Ky., 562 S.W.2d 622 (1978), is that in *Wells* the privilege did not exist when the previous testimony was given, whereas in this instance it existed but was waived. There is no difference in principle. In each case the evidence was good when given, and could not be made otherwise by subsequent events.

The argument that the deposition was not taken pursuant to an order of court after notice and a hearing is about as unfair as the contention that Richmond was denied an adequate opportunity of confrontation. The deposition was taken at the courthouse and was presided over by the trial judge himself. Counsel for Richmond was present and made his objections. All of the protections designed to be effected by the procedure specified in RCr 7.10 et seq. were satisfied by the trial-type setting in which the evidence was taken—mainly, of course, by the presence and participation of the trial judge. What could a previous motion and hearing have accomplished that could not have been, or was not, accomplished in this manner? An adverse ruling at an earlier time would, of course, have given Richmond's counsel more time to decide whether he would have Richmond present, but there is no reason to believe he could not have had it for the asking on February 25, 1980, the day on which the deposition was taken. Richmond, the attorney said, was then living with his parents in the town of Milton, in the adjoining county. Counsel could have asked for a few minutes' time to get in touch with him, or for an hour in which to secure his presence, but he did not do so. All too clearly, the truth appears to be that he did not want his client there, but preferred that he stay out of sight in order to provide some semblance of plausibility to the denial-of-confrontation argument. To

put it mildly, however, we do not intend to have our courts in this state subjected to that kind of gamesmanship.

We have reviewed the record with respect to the other irregularities alleged to have occurred during the trial and are of the opinion that there was no prejudicial error.

The judgment is affirmed.

All concur.