COMMONWEALTH of
Kentucky, Movant

v.

Shannandoah CARMAN and Kenneth Westbay, Respondents

2013–SC–000684–CL

Supreme Court of Kentucky.

RENDERED: FEBRUARY 19, 2015

Counsel for Movant: Michael J. O'Connell, Jefferson County Attorney, David A. Sexton, Assistant Jefferson County Attorney.

Counsel for Respondent Shannandoah Carman: James R. Moore.

Counsel for Respondent Kenneth Westbay: Michael Romano Mazzoli, Louisville, Scott James Barton.

## OPINION OF THE COURT BY JUSTICE ABRAMSON

Under Section 115 of the Kentucky Constitution and Kentucky Rule of Civil Procedure (CR) 76.37(10), the Commonwealth, by and through the Jefferson County Attorney, moved this Court to certify the law on the following question:

> In light of this Court's decision in *Commonwealth v. Wilson*, 384 S.W.3d 113 (Ky.2012), does Kentucky law authorize *ex parte* communications to change the conditions of release after the initial fixing of bail with no notice for the Commonwealth to be heard?

The certified question refers to *Commonwealth v. Wilson*, a case arising from a previous certification of law request by the Jefferson County Attorney. In that case, a Jefferson District Court judge issued a warrant for Wilson's arrest, and shortly thereafter Wilson's attorney made an *ex parte* request of another District Court judge to set aside the warrant and issue a summons instead. Without notice to the Commonwealth, the second judge granted Wilson's request. The County Attorney represented that such *ex parte* motions by defense counsel to vacate or to set aside arrest warrants were business as usual in Jefferson District Court. We answered the certified question in *Wilson* as to the legality of that practice with an emphatic condemnation: "We need go no further to deplore this practice than Supreme Court Rule 4.300, Canon 3(B)(7), which prohibits *ex parte* contacts in these circumstances." In this case, the County Attorney alleges a similar, recurring violation of the Supreme Court Rules, this one involving the issue of *ex parte* contacts regarding bail. Upon careful consideration of the rule applicable to certification of questions of law by the Commonwealth, we conclude that we improvidently granted the certification request in this case. However, given the

importance of the issue presented, we elect to employ our discretionary authority under Section 110 of the Kentucky Constitution to issue a general writ of prohibition "to exercise control of the Court of Justice." Simply put, judges are prohibited from engaging in *ex parte* communications to change the conditions of a defendant's release after the initial fixing of bail, such practice being another clear violation of SCR 4.300, Canon 3(B)(7).

## FACTS

At about 1:00 p.m. on July 24, 2013, Louisville Metro Police Department narcotics detectives executed a search warrant for a residence in the 2500 block of Bank Street in Louisville. The search revealed illegal drugs—methamphetamine and marijuana—and the paraphernalia of drug use and trafficking—pipes for smoking the drugs along with digital scales, torn baggies, a large sum of cash, and a 9 mm handgun. The officers arrested the three individuals present, brothers Kenneth Westbay and Shannandoah Carman, and their friend Robert Jecker, and charged the three men with trafficking in a controlled substance, possession of marijuana, and possession of drug paraphernalia. Westbay and Jecker were further charged with being convicted felons in possession of a hand gun.

Although the record is silent as to the details of what happened next, there is no dispute that the three suspects were booked routinely into the Jefferson County Jail and that at some point they were interviewed by Pretrial Services employees, who prepared reports on each of them including assessments of the risks each posed if released from custody. Nor is there any dispute that the suspects were not arraigned that day. Instead, their cases were referred to the "duty" judge, for that day,[1] Judge David Bowles. Judge Bowles ordered that the men were not to be released without the posting of a bail bond—$5,000 full-cash each for Westbay and Jecker, and $1,000 full-cash for Carman. Arraignments were scheduled for 9:00 a.m. the next day.

Early the next day, however, a different District Judge, Judge Donald Armstrong,[2] apparently phoned the Pretrial Services office and ordered that Westbay and Carman be released on their own recognizance.[3] The orders of release, on which Judge Armstrong's name is noted, also postponed the two suspects' arraignments for four days until July 29, 2013.

The record does not indicate what prompted Judge Armstrong's intervention,[4] but the Commonwealth asserts that phone conversations recorded at the jail between Carmen and his mother include comments by the mother to the effect that someone "pulled strings" on Carman's behalf so as to bring about his release. Armed with this information, at the July 29, 2013 joint arraignment of Westbay and Carman, the Commonwealth maintained that Judge Armstrong's release of the two men was improper. The Commonwealth

---

1. The local Rules of the Jefferson District Court provide for the assignment each day (7:00 a.m. to 7:00 a.m. the following day) of a judge to handle emergency matters, which includes the reviewing and setting of bail. Jefferson District Court Local Rule (JDRP) 207. The parties assert that the Jefferson District Court in fact has two "duty" judges each day, essentially a primary on-call duty judge and a secondary duty judge.

2. Judge Armstrong is no longer a Jefferson District Court judge.

3. Jecker remained in jail on the bond set by Judge Bowles.

4. We note that none of the counsel of record were involved with this *ex parte* conduct.

argued the releases were not authorized, because Judge Armstrong was not one of the duty judges, nor were they procedurally valid, because the Commonwealth had not been notified and thus had no opportunity to be heard on the matter. Accordingly, the Commonwealth moved to have Judge Armstrong's order set aside and Judge Bowles's original bond order for the two men reinstated.

The judge to whom the case was assigned, Judge Stephanie Burke, explained that the *ex parte* modification of bond prior to arraignment was not uncommon and declined to grant the Commonwealth's motion. Judge Burke commented that at least some members of the Jefferson District Court bench considered *ex parte* contacts prior to arraignment permissible, interpreting the "initial fixing of bond," SCR 4.300, Canon 3(B)(7)(a) as not occurring until arraignment. Concerned, however, that the taped jail telephone conversations suggested an impropriety, the court did agree to take up the matter again a few days later, when the Commonwealth would be allowed the opportunity to present its evidence.

The case was reconvened on August 5, 2013, but at that point newly retained counsel for Westbay requested a continuance, and the Commonwealth agreed that a continuance would be appropriate. The trial court concurred and rescheduled the matter for August 29, 2013. In the course

of doing so, however, it indicated that upon further reflection it did not consider itself authorized to pass upon either the propriety or the correctness of a coordinate judge's order. If the Commonwealth wished to pursue its disagreement with Judge Armstrong's actions in the case, the court advised, it would need to bring its claims in a forum authorized to hear them. Declaring itself at a loss as to what alternative forum might exist for discovering who had contacted Judge Armstrong and how the challenged release orders had been issued, the Commonwealth asked for and was granted an opportunity to brief the question of the trial court's authority to reinstate the original bail bonds.

Notwithstanding the Commonwealth's brief, Judge Burke's position had not altered by August 29, 2013, when Carman next appeared before the court and agreed to forego a probable cause hearing and to waive his case to the grand jury.[5] The court again denied the Commonwealth's motion to reinstate the cash bonds originally set by Judge Bowles, and, emphasizing that this was not the appropriate forum to address the propriety of Judge Armstrong's order setting aside those bonds, it refused the Commonwealth's request to have an evidentiary hearing addressing Judge Armstrong's involvement in the case. While acknowledging that under *Bolton v. Irvin*, 373 S.W.3d 432 (Ky.2012),[6] it had authority, at the proba-

---

5. Westbay did not appear in court that day, and the Commonwealth did not miss the opportunity to assert that his apparent absconding underscored the importance of the Commonwealth's input regarding any pre-trial-release decision. Westbay was not long at large, however, and official court records reflect that both cases have since concluded in the Circuit Court. *See Rogers v. Commonwealth*, 366 S.W.3d 446, 451 (Ky.2012);(KRE 201(b) allows for judicial notice of official court records). The charges against Carman were ultimately dismissed, and those against

Westbay were reduced in exchange, it appears, for his guilty plea.

6. In *Bolton*, an initial bail bond of $10,000 was increased after a finding of probable cause to $100,000. The defendant claimed that the increase was unlawful because it had not been based on a finding of changed circumstances following an evidentiary hearing, as required by RCr 4.40 and RCr 4.42. This Court upheld the increased bond and explained that the rules for modifying bail did not apply to the probable cause hearing since

ble-cause-hearing stage, to consider the bond issue anew, the trial court nevertheless denied the Commonwealth's request that Carman's release be conditioned on his posting a $1,000 full-cash bond. The court noted that the Pretrial Services employee had initially recommended Carman's recognizance release, and he had in fact shown up for every hearing. The case having ended in the district court, the Commonwealth brought its concerns regarding the *ex parte* bail order to us by way of the certified question noted above.

This Court initially entered an order on November 21, 2013, denying the Commonwealth's request for certification of the law regarding the *ex parte* amendment of conditions of release. The Commonwealth then filed a motion for reconsideration pursuant to CR 76.38, requesting that we reassess our prior denial of its certification request. That motion was granted, and we allowed certification of the question of law, received briefs from the parties and held oral arguments. Having carefully considered the facts of this matter, the language of our civil rules and prior opinions of this Court, we conclude that our initial decision denying the Commonwealth's request to certify the law was the correct one.

### ANALYSIS

I. **Although the Certification of Law is Improper, this Court may Issue a Writ Under Section 110 of the Kentucky Constitution.**

Section 115[7] of the Kentucky Constitution expressly prohibits the Common-

wealth from appealing the acquittal of a criminal defendant, but that same provision, when read with CR 76.37, permits the Commonwealth to certify a question of law to this Court. Subsection (10) of CR 76.37, the provision of the certification rule specific to the Commonwealth, provides as follows:

A request by the Commonwealth of Kentucky pursuant to Section 115 of the Constitution of Kentucky for a certification of law shall be initiated in the Supreme Court. The request shall be initiated within thirty (30) days of a final order adverse to the Commonwealth. The Commonwealth shall initiate the certification procedure by motion requesting the Supreme Court to accept the question(s) for review. The motion shall contain the same elements as provided in this Rule, section (3), for a certification order. The motion shall be served and response permitted in conformity with the rules applicable to motion practice in the Supreme Court. If the motion is sustained, thereafter the case shall proceed in the same manner as any other appeal.

■ By the plain language of the rule, the Commonwealth must initiate a request for certification of a question of law in this Court within thirty days "of a **final order** adverse to the Commonwealth." CR 76.37(10) (emphasis added). The facts before us plainly do not permit certification because neither an order for the initial setting of bail nor a subsequent order modifying bail is a final order adverse to the Commonwealth. An order setting bail

RCr 3.14(1) expressly contemplates a *de novo* bail determination at that "milestone" stage of the criminal process. *Bolton,* 373 S.W.3d at 436.

7. The relevant portion of Section 115 states:

In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court, except that the Commonwealth may not appeal from a judgment of acquittal in a criminal case, other than for the purpose of securing a certification of law ....

is, at best, interlocutory in nature. Under Kentucky Rule of Criminal Procedure (RCr) 4.40, a defendant may apply for a change in the conditions of release "at any time" before trial. In addition, RCr 4.38 mandates the review of the conditions of release for individuals detained for more than twenty-four hours, thus contemplating a reevaluation even without a request by the defendant. Beyond the finality issue, this Court has held in the past that a certification request from the Commonwealth is proper *only* after an acquittal. *See Commonwealth v. Bailey,* 71 S.W.3d 73, 83 (Ky.2002). Because the orders setting and modifying bond conditions (and indeed all subsequent orders in the case) were not final orders adverse to the Commonwealth as required by our rule, this Court cannot properly exercise its jurisdiction to certify the law.

Admittedly, in the motion requesting reconsideration of this Court's original denial of the certification request, the Commonwealth cited several cases where the Court *has* certified a question of law despite there being no final order from a lower court.[8] On closer consideration, the common thread in the cases cited by the Commonwealth is that this Court *never* addressed the jurisdictional issue of whether a final order had been entered. Presumably, the parties never raised this specific issue and the Court itself did not consider the matter. Whatever the reason for the failure to address this jurisdictional defect, we are not bound to perpetuate an erroneous application of our certification of law process. *See Morrow v. Commonwealth,* 77 S.W.3d 558, 559 (Ky.2002). ("[R]espect for precedent demands proper reconsideration when we find sound legal reasons to

question the correctness of our prior analysis"). *Crayton v. Commonwealth,* 846 S.W.2d 684, 689 (Ky.1992) (As to the Court's authority to interpret legal questions, "it is our duty to continually reexamine our prior decisions to prevent perpetuation of error."). Finding these anomalous certification cases unpersuasive in the face of the plain language of Section 115 and CR 76.37, we hold that the Commonwealth's motion to certify the question of law was improvidently granted.

Although this Court cannot appropriately certify the law under Section 115 and CR 76.37 in the absence of a final order adverse to the Commonwealth, that conclusion does not end the matter in this particular case. Section 110 of the Kentucky Constitution vests this Court with the power "to issue all writs necessary in aid of its appellate jurisdiction, or the complete determination of any cause, **or as may be required to exercise control of the Court of Justice.**" Ky. Const. § 110(2)(a) (emphasis added). In *Abernathy v. Nicholson,* 899 S.W.2d 85, 88 (Ky. 1995), the Court closely analyzed Section 110(2)(a), explaining:

> Initially it should be conceded that this Court possesses the raw power to entertain any case which fits generally within the rubric of its constitutional grant of authority. As Section 110(2)(a) of the Constitution contains a provision which grants the Supreme Court supervisory control of the Court of Justice, virtually any matter within that context would be subject to its jurisdiction.

The *Abernathy* Court went on to recognize the discretionary nature of the grant

---

**8.** The Commonwealth cites *Wilson,* 384 S.W.3d 113; *Commonwealth v. Ingram,* 46 S.W.3d 569 (Ky.2001); *Commonwealth v. Davis,* 25 S.W.3d 106 (Ky.2000); *Commonwealth v. Lopez,* 3 S.W.3d 351 (Ky.1999); and

*Commonwealth v. Raines,* 847 S.W.2d 724 (Ky.1993) *(overruled on other grounds by Commonwealth v. Howard,* 969 S.W.2d 700 (Ky. 1998)).

of authority in Section 110(2)(a), stressing that the Court should exercise its supervisory power sparingly, and, "generally only in cases where no other court has power to proceed." *Id.* While the Kentucky Constitution confers nearly identical appellate writ authority upon the Supreme Court and the Court of Appeals, the authority to exercise control and supervision over the Court of Justice by writ is vested *exclusively* in the Supreme Court. *Compare* Ky. Const. § 110(2)(a) *with* § 111(2); *see also Francis v. Taylor*, 593 S.W.2d 514, 515–16 (Ky.1980).

■ The facts of record here, as well as the facts of the *Wilson* case, reflect an *ex parte* culture among some members of the Jefferson District Court and some members of the bar that appears completely inconsistent with the ethical execution of judicial duties. To the extent clandestine communication between some attorneys and some sitting judges in contravention of our rules has become a recurring problem there is a clear issue in the administration of justice that cannot be addressed by either the Circuit Court or by the Court of Appeals. *Id.* at 87. However, this Court can and, in its discretion, will do so in order to "exercise control of the Court of Justice," Ky. Const., § 110. Before turning to the specific concerns regarding *ex parte* communications, it is appropriate to outline the rather unique nature of a so-called supervisory writ pursuant to Section 110(2)(a).

■ Normally a writ opinion of this Court begins with a discussion of the discretionary nature of writs and a classification of the case as one where either (a) the lower court is allegedly acting outside its jurisdiction or (b) the lower court is allegedly acting within its jurisdiction but erroneously. *See, e.g., Hoskins v. Maricle*, 150 S.W.3d 1, 10 (Ky.2004). Regardless of which class of writ applies, a case is pending in a lower court and the focus of the writ petition before this Court is the action or inaction of that particular lower court in that particular case. *But see Commonwealth, Dept. of Corrections v. Engle*, 302 S.W.3d 60, 62–64 (Ky.2010) (writ issued despite mootness because dispute as to orders regarding transportation of inmates is capable of repetition, yet evades review). In *Francis v. Taylor*, 593 S.W.2d at 514, former Chief Justice Stephens referred to this usual form of appellate writ as a "revisory" writ as opposed to those writs available only in the Supreme Court under Section 110 of the Kentucky Constitution "to exercise control of the Court of Justice," which he labeled "supervisory" writs. Where, as here, a supervisory writ is necessary to address an ongoing practice that is not limited to one case or even one judge, and the broader concern is this Court's control over the proper functioning of our courts, the usual appellate writ standard applicable to revisory writs is not applicable. Instead, this Court, exercising the discretion recognized in *Abernathy, supra*, simply must determine whether the circumstances are sufficiently compelling to merit a supervisory writ. Even if the record in this case did not include recognition by a judge of the Jefferson District Court and the counsel before the Court that *ex parte* contacts regarding bail are not uncommon, certainly this record when considered as post-*Wilson* conduct within the same jurisdiction in which *Wilson* arose, leaves little doubt that this is that rare and "compelling" circumstance where a supervisory writ is appropriate. The standard in such matters is very simply whether a majority of this Court believes the circumstances merit a supervisory writ and, in this case, that standard is met.

## II. *Ex Parte* Communications to Modify the Conditions of Release are Improper.

Our Criminal Rules contemplate that criminal charges are to be converted from

off-the-record police proceedings to on-the-record judicial proceedings as quickly as reasonably possible, or, as the rules put it, "without unnecessary delay." RCr 3.02(2). As the rule implies, however, some delay is necessary; a police case cannot instantly be converted into a court case. Data must be collected and communicated to court clerks; files must be opened and records entered in them; cases must be assigned to a particular docket. This case involves that somewhat "grey" pre-arraignment period the Criminal Rules seek to minimize, but do not and probably cannot regulate with a high degree of clarity.

■ As our lengthy rendition of the facts of this case makes clear, pre-arraignment bail determinations during this "grey" period are made without a formal appearance and with a simple notation on the "record" as it exists. Ordinarily, the formal record begins with what the Jefferson District Court Rules refer to as the arraignment, JDRP 602,[9] and what the Criminal Rules refer to as the "initial appearance," RCr 3.02, *i.e.*, the defendant's first appearance before the judge assigned to the case.[10] Because this arraignment, or initial appearance on the record, is ev-

ery bit as much a "milestone" in the proceedings as the probable cause hearing we considered in *Bolton v. Irvin*, it too marks a point at which the rules expressly contemplate that the judge will consider bail anew, without being bound by prior orders, if there happen to be any. Here, the trial court and the Commonwealth need not have debated the court's authority to set aside a coordinate district judge's order, since at that point the trial court was not bound by that order in any event. The real issue, as the Commonwealth sought to have answered in its certification request, was whether the duty judge's order that initially set the bond could be modified by another judge following an *ex parte* contact without contravening our rules.

**a. Pre-arraignment bail order may be modified only by the duty judge to whom the matter is "assigned."**

■ The rules of Jefferson District Court deal with the pre-arraignment "grey" period by implementing a formal process, which includes what may be thought of as an "after hours" protocol.[11] Jefferson District Rule of Procedure (JDRP) 207,[12] the local rule providing for

---

9. "[A]ll persons arrested and in custody of Louisville Metro Corrections shall be arraigned on the date of arrest, or the next following scheduled court day. A person held in custody shall not be detained for more than forty-eight (48) hours from the time of arrest without being arraigned, unless there are exigent circumstances to be determined by a judge, which prevent arraignment within the forty-eight (48) hour period."

10. At arraignment the judge must, on the record, inform the defendant of the charges against him; advise and caution the defendant as otherwise required by RCr 3.05; appoint counsel if need be, RCr 3.05(2); find, if the defendant is being held pursuant to a warrantless arrest, that the arrest was supported by probable cause, *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); and consider pretrial re-

lease and bail in accord with Section IV of the Criminal Rules, KRS 431.066, and KRS 431.525.

11. This "after hours" protocol appears more clearly in other local rules, such as Jefferson County Domestic Violence Protocol IV(A), which provides a formal process for filing domestic violence petitions after regular office hours.

12. "The Chief District Court Judge shall assign a Judge to be on duty each day from 7:00 a.m. to 7:00 a.m. the following day to take care of emergency matters. District Court Trial Commissioners, with the approval of the Chief Justice of the Supreme Court and appointed by the Chief Judge of District Court, shall be on duty simultaneously with a District Court Judge every night from 11:00 p.m. to 7:00 a.m. for specific emergency matters.

duty judges, directs the Chief District Judge to "assign a Judge to be on duty each day from 7:00 a.m. to 7:00 a.m. the following day to take care of emergency matters." Through custom and practice, the setting of pre-arraignment bail and conditions of release, at least after hours, has fallen to the duty judge as an "emergency matter." As the Commonwealth notes, JDRP 207 was intended to "assign" duty judges to these matters in the same spirit of "assignment" as contemplated by SCR 1.040(4)(c). Under that rule, "[i]n the absence of good cause to the contrary, all matters connected with a pending or supplemental proceeding shall be heard by the judge to whom the proceeding was originally assigned." SCR. 1.040(4)(c). Therefore, all matters "connected with a pending or supplemental proceeding" before a JDRP 207 duty judge (such as the bond decisions at issue here) are to be heard by the duty judge "to whom the proceeding was originally assigned." SCR 1.040(4)(c). This interpretation prevents "judge-shopping" tactics like the ones employed in Carman and Westbay's case[13]—once a duty judge has proceeded to initially fix bail pre-arraignment, the next judge to take the matter under consideration is the judge to whom the case is ultimately assigned for arraignment and beyond. As of arraignment (the moment at which this "grey" period ends), bail decisions become the responsibility of the judge to whom the case is assigned, and resort may not be had, *ex parte* or otherwise, to a different judge, except as the rules provide.

 With respect to the general authority of other district judges (someone like Judge Armstrong who was neither the duty judge pre-arraignment nor the judge the case was assigned to for arraignment), the parties do not dispute that as a general matter bail is a judicial determination, *Clemons v. Commonwealth,* 152 S.W.3d 256, 259 (Ky.App.2004) ("[T]he decision to impose, forfeit, or remit [bail] bonds lies solely with the trial court."), and that RCr 4.04(3), which provides that "[t]he court shall determine the method of pre-trial release and the manner in which a bail bond is executed," recognizes an equal authority in all of the judges through whom the "court" acts to set and review bail. *Cf. Richmond v. Commonwealth,* 637 S.W.2d 642, 646 (Ky.1982) (holding, with respect to the authority to issue search warrants, that "district ... judges ... are ... members of the same court and have equal capacity to act throughout the Commonwealth, subject to the administrative authority of the respective chief judges and the Chief Justice and subject to the rulemaking power of the Supreme Court"). However, under our interpretation of JDRP 207 and SCR 1.040(4)(c), the only judge authorized to "act" in the *initial* setting of bail for Carman and Westbay

Presently, the Trial Commissioner's duties from 11:00 p.m. to 7:00 a.m. are to review and set bail, review emergency protective petitions, review emergency custody petitions, review juvenile detentions, and review adult mental inquest petitions. Appropriate agencies may contact the Trial Commissioners directly; but all other contact, e.g.: search warrants and juvenile mental inquest petitions, should be through the District Court Judge on duty."

13. As noted above, because the defendants in this case could not be, or at least were not, arraigned the day they were arrested, a pre-arraignment bail decision was made by the "duty" judge on call at the time. He ordered that the defendants be detained pending their arraignments the next morning unless they posted full-cash bonds. Some hours later, prior to the scheduled arraignment but after, it appears, the "duty" judge's shift had ended, a different judge ordered the defendants released on their own recognizance, an order which apparently had the effect of postponing the arraignments.

was the duty judge to whom the "emergency matter" was first assigned. Therefore, while we recognize that district court judges within a multi-judge jurisdiction possess coequal authority, we conclude that pre-arraignment bail, once set by the assigned duty judge, should not be modified by a different judge, and any modification must await arraignment before the judge to whom the case is assigned.

**b. *Ex parte* communication to modify the conditions of release after the initial fixing of bail is improper.**

While a number of an arrested person's important rights are implicated during the pre-arraignment period, *e.g.*, *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (holding that the Fourth Amendment of United States Constitution requires a judicial determination of probable cause either before or promptly after arrest); *Westerman v. Cary*, 125 Wash.2d 277, 892 P.2d 1067 (1994) (addressing when the right to bail attaches under a constitutional provision similar to Ky. Const. § 16), the *ex parte* contacts which prompted this matter do not require us to explore any of those rights or even to delve too deeply into the Criminal Rules. As in *Commonwealth v. Wilson*, SCR 4.300 Canon 3(7) provides, we believe, sufficient guidance.

 Individuals, to be sure, have an important liberty interest in bail, an interest protected by Section 16 of the Kentucky Constitution.[14] The Commonwealth has a significant stake in bail determinations, too, however, including a strong interest in seeing that persons duly charged with crimes are available to be tried. *United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). As the

Commonwealth notes, and as we emphasized in *Wilson*, our system of justice is predicated upon opposing interests being given a fair opportunity to be heard before a neutral decision maker. To that end, Supreme Court Rule (SCR) 4.300 Canon 3(B)(7) provides that:

> [a] judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. With regard to a pending or impending proceeding, a judge shall not initiate, permit, or consider ex parte communications with attorneys [or] . . . with parties.

When asked to certify the question of whether Kentucky law authorizes *ex parte* contact with a judge for the purpose of setting aside an arrest warrant in *Wilson*, this Court soundly condemned the practice with the unequivocal message: **"We forbid it."** *Wilson*, 384 S.W.3d at 114 (emphasis added). As in *Wilson*, we believe that the *ex parte* bail modification that occurred in this case (and allegedly others) indisputably ran afoul of SCR 4.300 Canon 3(B)(7).

Against this result, the Respondents note that Canon 3(B)(7) goes on to provide for some exceptions to the general ban on *ex parte* communications:

> Where circumstances require, ex parte communications for scheduling, *initial fixing of bail*, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized.

SCR 4.300 Canon 3(B)(7)(a) (emphasis added). Apparently some Jefferson District Court judges have interpreted "the initial fixing of bail"[15] to refer to the pe-

---

14. We express no opinion about that Section's application to pre-arraignment bail.

15. The "initial fixing of bail" under Canon 3(B)(7) should not be confused with the de-

fendant's "initial appearance before the judge" as provided for in RCr 3.02. Under the latter rule, bail should be determined, on the record, at the initial appearance or ar-

riod preceding the order issued at arraignment. Under this reading, any pre-arraignment bail determination can be addressed in an *ex parte* communication, whereas as of arraignment it should not be. This "bright line" approach to the "initial fixing of bail" is the preferable option, according to the Respondents, given that in the topsy-turvy first few hours after an arrest several individuals—prosecutors, police officers, defense counsel—may all seek bail rulings from different judges, none of whom knows about the actions of the others. In the event of conflicting orders, jail officials need a way to determine which order controls, and a rule favoring the last order entered at least, according to the Respondents, has the virtue of being workable. This argument ignores the fact that by having a duty judge under their local rules the Jefferson District Court has already imposed order on these initial hectic hours by identifying which specific judge will make the bond decision. Pretrial Services employees need look no further than the duty roster to determine to whom that task has been assigned at any given time. And, most certainly, when a judge exercises authority, as Judge Bowles did by setting bonds for Westbay and Carman, bond has initially been set.

Moreover, our Supreme Court Rule does not really permit unfettered *ex parte* contacts as to the initial setting of bail. There are limitations on *ex parte* contacts even then. The Rule excepts initial bail determinations from the general rule against *ex parte* proceedings but only "[w]here circumstances require," SCR 4.300 Canon 3(B)(7)(a), and only provided that:

(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and

(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.

SCR 4.300 Canon 3(B)(7)(a)(i)-(ii). So even if we were to construe the "initial setting of bail" broadly there are strictures in our Rule that clearly were not observed in this case.

■ To reiterate, in the pre-arraignment context, "initial" means the *first* opportunity for a judge or judicial officer [16] to fix bail. Of course, the first judge to consider bail (that is the time of the "initial fixing of bail"), may engage in *ex parte* communications about bail before entering his or her order, but only "where circumstances require" and provided he or she does so consistent with Canon 3(B)(7)(a)(i)-(ii). We expressly reject the contention that "initial" fixing of bail is meant to encompass a malleable timeframe that ends only at arraignment and that multiple pre-arraignment bail orders from different judges are permissible. If we were to adopt such an interpretation of "initial fixing of bail," we would ratify the practice of judge-shopping, allowing parties to contact numerous judges *ex parte* until a favorable decision is achieved. To reiterate *Wilson's* explicit, succinct prohibition against improper *ex parte* communications: "we forbid it." 384 S.W.3d at 114. Pre-arraignment bail orders, like arrest warrants, are not to be modified *ex parte*, because, by definition, the initial setting of bail has already occurred.

---

raignment, but that need not be the initial fixing of bail, since, as in this case, a pre-arraignment bail may, and most likely will, have been fixed by a duty judge.

**16.** To the extent Trial Commissioners are tasked with the responsibility, *see* fn. 12, they stand in the same position as a judge.

## CONCLUSION

The Commonwealth's request for certification of the law was improvidently granted. This Court instead issues a supervisory writ of prohibition pursuant to Section 110(2)(a) of the Kentucky Constitution directing all judges of the Court of Justice to cease any *ex parte* communications regarding a criminal defendant's conditions of release after the initial fixing of bail.

Minton, C.J.; Abramson, Cunningham, Keller, Noble, and Venters, JJ., sitting. All concur.